The CONSERVATION SOCIETY OF
SOUTHERN VERMONT, INC., et al.

v.

SECRETARY OF TRANSPORTATION
et al.

Civ. A. No. 6598

United States District Court,
D. Vermont.

July 27, 1973.

Frederick Pope, Jr., Bellows Falls, Vt., for Conservation Society of Southern Vermont.

Harvey D. Carter, Jr., Bennington, Vt., for Winslow, Eldred, Van Keuren and Wasco individually.

George W. F. Cook, U. S. Atty., Rutland, Vt., for Secretary of Transp. and Federal Highway Administration.

Robert C. Schwartz, Asst. Atty. Gen., Montpelier, Vt., for Vermont State Highway Board and Vermont Highway Dept.

Angus Macbeth, New York City, and William F. Morrill, Lakeville, Conn., for The Natural Resources Defense Council, Inc.; Environmental Defense Fund; The Sierra Club; Berkshire Litchfield Environmental Council, Inc.; Citizens for Balanced Transportation and Environment, Inc., The Hoosic River Basin Citizens Environmental Protection Assn.; Housatonic Valley Assn.; The Lake Champlain Committee; South Berkshire Research; Western Mass. Public Interest Research Group; Vermont Public Interest Research Group, amici curiae.

## FINDINGS OF FACT, OPINION and ORDER

OAKES, Circuit Judge.

The above entitled action came on for hearing on the motion by the defendants Secretary of Transportation and David B. Kelley, Division Engineer, Federal Highway Administration (FHWA) (hereinafter the "federal defendants") and H. James Wallace et al. (hereinafter the "state defendants"), filed jointly on March 20, 1973, for an order dissolving this court's injunction of October 26, 1972. See 343 F.Supp. 761 (D.Vt.1972). The ground for dissolution was that the environmental impact statement (the

EIS) required by the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332(2)(C), ordered to be filed by this court had been duly prepared and filed and was sufficient and that the identical requirements of § 4(f) of the Department of Transportation Act, 49 U.S.C. § 1653(f), and § 138 of the Federal-Aid Highway Act of 1968, 23 U.S.C. § 138 [hereinafter sometimes jointly referred to as § 4(f)], had been duly met. Following preliminary argument on the motion to dissolve the injunction, on April 23, 1973, evidence was taken on May 10 and 11, 1973, and the parties granted leave until May 24, 1973, to file additional memoranda and supporting materials. At the time of the taking of the evidence, for the limited purpose of filing memoranda of law, The Natural Resources Defense Council, Inc., and a number of other conservation-oriented organizations, national, regional and local, were granted leave to appear as amici curiae.

The parties have briefed, and evidence was taken on, four issues:

1. Whether the EIS was prepared by, or under the supervision of, the Department of Transportation, and whether it was required so to be prepared;

2. Whether the EIS as filed met the requirements of NEPA, *i.e.*, was sufficient;

3. Whether the Bennington to Manchester, Vermont, segment of Route 7 proposed to be constructed and covered by the EIS was simply a part of a larger plan or proposal for an improved Route 7 in the states of Connecticut, Massachusetts and Vermont so as to require an EIS for the entire length of existing Route 7; and

4. To what extent certain United States Forest Lands would be used or affected by the proposed highway, and how such use or effect relates to the requirements of § 4(f).

Each of these issues and the evidence in respect thereto will be discussed separately below, so as to present a full record for any appeal, and the discussion in respect to each shall be treated as findings of fact and conclusions of law thereon.

I. *Whether the EIS constituted a "detailed Statement by the responsible official" within NEPA § 102(2)(C).*

On its face or cover sheet the EIS shows that it was "[p]repared by Vermont Department of Highways." This was done pursuant to the Department of Transportation's (DOT's) Policy and Procedure Memorandum (PPM) 90–1 which specifically provides that a state highway agency shall prepare and circulate a draft EIS in cooperation with the FHWA, ¶ 6b, "shall prepare a final environmental statement or combined environmental/4(f) statement in consultation with the FHWA . . . ," ¶ 6i, and that "FHWA review and adoption of the final impact statement shall be the responsibility of the Regional Federal Highway Administrator." ¶ 6j. Here the regional FHWA office essentially delegated consultation duties in regard to the EIS to the federal division engineer in Vermont, defendant Kelley. He in turn commented on the draft EIS primarily through his engineering coordinator, Gordon Hoxie. Mr. Hoxie maintained frequent contact with the Vermont Highway Department (VHD) during the course of the work involved in preparation by the VHD, or more specifically the rural planning section of the VHD. The individual primarily responsible for the writing and preparation of the EIS was VHD planning engineer Arthur Goss. During the time of EIS preparation engineer Hoxie was in verbal communication with VHD's Goss two or three times weekly. On one occasion FHWA division engineer Kelley went on a field trip, during which the proposed route was examined and environmental considerations noted and discussed, with representatives of the VHD accompanied by two independent environmental consultants, Frederick H. Mold and William C. Horsford, as well as by representatives of the Vermont Fish and Game Department. After a draft EIS was pre-

pared by the VHD in consultation with but not under the supervision of the FHWA it was submitted to the public for comment and to the division office of FHWA in Montpelier, Vermont, and the regional office in Delmar, New York.

The division office, and more particularly Mr. Hoxie as engineering coordinator and the right of way officer, the planning engineer and the area engineer all reviewed the EIS. At the regional office the draft EIS was examined by Donato J. Altobelli, director of the Office of Environment and Design, who in turn circulated it to a FHWA "Regional Task Force" for consideration. This "Task Force" consisted of Mr. Altobelli and his assistant, bridge and construction engineers, a hydraulics engineer, a landscape architect, a "regional relocation specialist," a regional urban planner and the Deputy Regional Federal Highway Administrator. It considered the draft EIS and through Messrs. Kelley and Hoxie submitted a letter to the VHD under date of October 10, 1972 (EIS at 428), commenting generally that it thought the EIS to be "a good representation of the adverse and beneficial environmental impacts of the proposed projects" and specifically making only three suggestions as follows: (1) calling for more "discussion of" the 25 improvements that will be taken and the persons displaced; (2) suggesting inclusion of "an assessment of the impact which the highway will have on future land uses of the surrounding area" and as a corollary the effect of the highway on residential and business property values; (3) calling for more discussion of the probable impact of the recommended alignment on the local area tax base.[1] Apparently all three of the suggestions of the FHWA were incorporated by the VHD in the final impact statement.

This case thus raises the very fundamental question whether FHWA proce-

dures requiring preparation of an EIS by the local state highway agency, with communication from and cooperation of the regional FHWA, followed by review by an FHWA "task force" at the regional level complies with NEPA and more particularly NEPA as construed by the Second Circuit Court of Appeals in Greene County Planning Board v. FPC, 455 F.2d 412 (2d Cir.), cert. denied, 409 U.S. 849, 93 S.Ct. 56, 34 L.Ed.2d 90 (1972). In Greene County, it will be recalled, the Second Circuit (per Kaufman, C. J.) held that in a procedure involving the licensing of transmission lines, the FPC could not properly merely review and circulate an EIS prepared by the Power Authority of the State of New York (PASNY, an independent state agency interested in power development), but had the "primary and nondelegable responsibility" to "consider environmental values 'at every distinctive and comprehensive stage of the [agency's] process.' " 455 F.2d at 420. Put another way, has the FHWA here, as the FPC was found to have done in Greene County, "abdicated a significant part of the responsibility by substituting the statement of [the VHD] for its own"? 455 F.2d at 420.

 The federal defendants argue that the VHD is unlike PASNY in the Greene County case and is in no sense an "applicant or contestant." Thus they argue that there is no likelihood that the EIS prepared by the VHD would be based upon the "self-serving assumptions" that the Second Circuit was particularly wary of in Greene County. In support of this purported distinction the federal defendants cite two United States District Court cases, National Forest Preservation Group v. Volpe, 352 F.Supp. 123 (D.Mont.1972), and Iowa Citizens for Environmental Quality, Inc. v. Volpe, 4 ERC 1755, 1759–60 (S.D. Iowa 1972), the former holding that there was no indication that the EIS in

---

1. Parenthetically the court notes that the only one of these suggestions relating directly to the environment is No. 2, and in that connection how an impact state- ment could be prepared without including an assessment of the impact on future land uses in the surrounding area escapes one.

the particular case was "self-serving" to the local highway department and that "It should not be presumed that states are not concerned with the environmental problems facing us all." 352 F.Supp. at 127. However true this may be, *Greene County* requires a different result. In Vermont, at least, the Vermont Highway Department has the duty, as testified to by Speaker of the House Kennedy and by Commissioner of Highways Gray, to follow legislative mandate in regard to proposed highway construction, and the construction here contemplated was legislatively mandated in 1968. Thus, it is impossible for the Vermont Highway Department not to be an advocate of legislatively mandated construction and still act consistently with its duty as a state agency. This being true, delegation of the preparation of an EIS to the VHD raises the danger that the EIS will reflect "self-serving assumptions" and brings the case directly within *Greene County*.

The federal defendants argue that the Army Corps of Engineers prepares its own EIS even though it plans, designs and constructs its own projects. However, unlike the VHD, the Army Corps of Engineers is the responsible federal agency for its projects, and whether its statements are more apt to be impartial than the VHD's is immaterial. The VHD's EIS is bound to be "self-serving" in the *Greene County* sense, and, therefore, delegation to it of the FHWA's duty of preparation is improper. The federal defendants point out that some federal agencies contract with consulting firms to prepare a given EIS; such a case is, however, not before the court.

It is true that the VHD will receive in the ordinary course of events primary system money for Vermont highways whether the particular highway here proposed is built or not but this is immaterial; the VHD will want to see that money spent where the Vermont legislature wants it spent, and to that extent the VHD is necessarily an advocate of the particular project. Required as the court is to reach this holding it is un-

necessary to determine whether highway trust funds—state or federal—are in and of themselves necessarily inconsistent with NEPA since they involve by definition an advance commitment of vast sums of money to highway-building —somewhere, sometime—with its many attendant impacts on the environment.

The federal defendants go on to argue, nevertheless, that the FHWA is simply a funding agency which does not plan, construct, design or license highways, so that the state highway departments are the real initial decision-makers. But the "major federal action" [NEPA § 102(2)(C)] we are talking about here is the commitment of federal money—several million dollars' worth— to the building of a highway within a state or states, and the real decisionmaker on whether such action should be taken is the FHWA.

Moreover, the FHWA approves the commitment of federal funds only when the highway proposed by the state(s) meets federal criteria. NEPA has now mandated that those criteria include the environmental considerations which NEPA sets forth. The detailed environmental impact statement must as § 102(2)(C) of the Act itself says and *Greene County* explicates, " 'accompany the proposal through the existing agency review processes.' " 455 F.2d at 421. Here we have the FHWA not only letting the VHD do the draft and final EIS preparatory work, but when the work reached final draft stage, the comments on it by the reviewing board were merely perfunctory, the equivalent of an agency rubber stamp. It is argued that this is the only practicable way for the federal agency to handle EIS preparations, since the individual state departments have hundreds of employees while the federal agency has—at least in its Montpelier office—only 14. This is, however, an argument to take to Congress, seeking either more funds for the conduct of the federal agency operations, a change in NEPA to permit such delegation, or the simple authority to use its existing funds in the preliminary explo-

ration of environmental impacts at the early stages of federal-state highway planning.

The final point intimated if not argued by the federal defendants on this issue is that the specific steps taken by them during preparation of the EIS by the state including communication, consultation and the field trip, when coupled with the regional review, do for all practical purposes amount to "preparation" by the responsible federal agency. According to the testimony of defendant Kelley, however, the Highway Department planning section prepared the EIS in accordance with PPM 90–1. There is no indication whatsoever that the FHWA or any of its employees conceived, wrote or even edited any section of or passage in the EIS. At the most there were informal chats touching upon the subject, together with the aforementioned field trip and subsequent "review." Perhaps this is the most practicable or feasible method of handling the preparation of an EIS under present federal and state highway agency procedures. But it is not what is required by NEPA, the purpose of which is to ensure that the *federal agency making the decision* consider environmental values, potential alternatives and the overall consequences of the proposed action.

To require genuine FHWA preparation of an EIS will obviously in this instance cause delay and, the court was advised by the testimony of Commissioner Gray, additional expense in connection with the construction, for which costs continue to inflate. But as the Court of Appeals for the District of Columbia said in the landmark Calvert Cliffs' Coordinating Committee v. AEC, 146 U.S.App.D.C. 33, 449 F.2d 1109, 1128 (D.C. Cir. 1971), as quoted in *Greene County, supra,* 455 F.2d at 423, "It is far more consistent with the purposes of the Act to delay operation at a stage where real environmental protection may come about than at a stage where corrective action may be so costly as to be impossible."

II. *Whether the EIS as filed was sufficient under NEPA.*

Assuming that the section of road referred to in the EIS (from Bennington to Manchester) is all that was required to be considered, plaintiffs argue that the EIS is insufficient in a number of respects: (1) that it is biased, as prepared by the VHD, as discussed under Point I above; (2) that it omits any reference to certain areas ·"of significant environmental sensitivity and considerable intrinsic value,", including certain groundwater recharge areas crossed by the proposed corridor, vegetation patterns on the Fayville Branch of the Battenkill River, the peculiar nature of the vegetation in the Chiselville Beaver Pond and the unusual character of a hemlock glen on the westernmost edge of the Lye Brook area; (3) that it fails sufficiently to consider alternatives including improvement to existing Route 7; and (4) that it fails properly to weigh cost and benefits from the proposed federal action.

This court must review the agency decision to see that not only the procedural requirements of NEPA have been complied with, but also that the substantive result of the agency's decision is consistent with a "good faith" weighing of the environmental impact of the project. Conservation Council of North Carolina v. Froehlke, 473 F.2d 664, 665 (4th Cir. 1973); Environmental Defense Fund, Inc. v. Corps of Engineers, 470 F.2d 289, 298 (8th Cir. 1972), cert. denied, 412 U.S. 931, 93 S.Ct. 2749, 37 L.Ed.2d 160 (1973). In other words,

District Courts have an obligation to review substantive agency decisions on the merits to determine if they are in accord with NEPA.

The review is a limited one for the purpose of determining whether the agency reached its decision after a full, good faith consideration of environmental factors made under the standards set forth in §§ 101 and 102 of NEPA; and whether the actual

balance of costs and benefits struck by the agency according to these standards was arbitrary or clearly gave insufficient weight to environmental factors. Environmental Defense Fund, Inc. v. Froehlke, 473 F.2d 346, 353 (8th Cir. 1972).

 To meet the "good faith consideration" test, Environmental Defense Fund, Inc. v. Corps of Engineers, *supra*, 470 F.2d at 300, the agency must show that it has adequately weighed the relevant environmental factors in deciding whether and how to go forward with the project. The agency itself need not show "subjective impartiality," *i. e.*, it can have (indeed as discussed below generally does have) a mandate to achieve certain goals which conflict with the preservation of the environment. Environmental Defense Fund, Inc. v. Corps of Engineers, *supra*, 470 F.2d at 295. In the case of the FHWA and the VHD, that goal is, of course, to build highways. But it must be demonstrated by the agency that with regard to the *specific* project for which the EIS is prepared, the agency has weighed with "good faith consideration" the environmental impact of the project and that the *agency will modify or drop the project* if the environmental costs are sufficient to outweigh the benefits of the project.

 1. There is inherent bias in the EIS here in issue in favor of the proposed highway construction and in derogation of environmental considerations since the VHD is charged with the duty of carrying out a legislative mandate as indicated above. This bias is evident in the rhapsodic prose of the Introduction to the EIS, incorporated herein by reference and attached as Appendix A. At the same time, with one exception noted below and discussed under Point IV, the body of the EIS evidences good faith consideration of the environmental values involved insofar as they relate to the particular segment of road contemplated. If preparation of the EIS by the VHD is found proper by an appellate court, contrary to this court's opinion that the *Greene County* case applies, then this court finds the EIS in substance not to have been biased. That is to say, the EIS demonstrates "good faith consideration," though not "subjective impartiality," and the elaborate Introduction may be treated as so much surplusage.

2. Examination of a 1972 Land Capability Plan of the State Planning Office furnished to the court by stipulation after the hearing and marked hereby as Court Exhibit 2 indicates that two possible gravel aquifer recharge areas and one probable bedrock aquifer recharge area are in the line of proposed construction. There was testimony that salt pollution occurring in connection with winter road maintenance can have significant adverse impact upon such aquifer recharge areas. There is no direct comment in the EIS in respect to salt pollution in these specific recharge areas, although the EIS does discuss generally the salt pollution problem (p. 43).[2] A botanist also testified as to the

2. Research indicates, however, that the major area of salt ion concentration is a narrow band 20 to 30 feet wide along the edge of the highway pavement. As far as the subject project is concerned, this primary salt concentration area would be within the highway right-of-way and would not generally extend to landscaped areas adjacent to the pavement. In selecting trees and shrubbery for landscaping care would be taken to insure that salt resistent [sic] species were used.

Testing of the soil and water supplies adjacent to highways indicates that out-side the primary band of influence, salt ion concentration is generally under 250 PPM, which is the limit set for drinkable water by the United States Public Health Service. Since the several public and private water supplies in the project corridor are located upwards of 0.3 mile from the highway location, no adverse effects are anticipated from movement of salt ions through the ground.

Environmental damage resulting from salt ion concentration in streams or rivers, either leached out of the soil from storm runoff or carried directly by melting snow, is equally unanticipated.

rather unique diversity of flora along the Fayville Branch and in the vicinity of the Chiselville Beaver Pond, as well as to an unusual hemlock glen near the Lye Brook area. The last was commented upon in the EIS as follows:

> The botanical significance of the area, because it represents both hardwood and softwood wetland, is not clearly evident, nor is the rarity of such a combination. Almost any interface of divergent natural conditions provides a fascinating study area and wetlands especially are rich in plant forms, insectivore, etc. The proposed highway, however, does not intrude on the central marsh area. Naturalists, game biologists and the forester who investigated the proposed alignment did not find anything they considered unique, rare or especially noteworthy in any way that would be disturbed by construction.

EIS at 52.

By implication the EIS may be said similarly to find unimportant the degree of flora diversity along the Fayville Branch. Finally, Harrington's Cobble, referred to in the opinion and order accompanying the original injunction on June 2, 1972, *see* 343 F.Supp. at 767, is specifically discussed on Pages 47–51 of the EIS and in a letter dated May 21, 1972, of Mr. Mold and Mr. Horsford, a nurseryman, reprinted as Exhibit M to the EIS. (That discussion and letter, as is the entire EIS, are hereby incorporated in this opinion by reference.) The essence of the consultants' findings is contained in the following paragraph:

> A considerable number of plant forms were observed. Many common varieties were profuse. A few were of less general distribution but would be considered as common locally. Still fewer are less well distributed as to be described as common but it was the consensus of the two specialists that *nothing* they found could be classified

as rare or unique and *all* could certainly be expected to occur nearby outside the proposed construction area.

EIS at 49 (emphasis original). The EIS goes on to say:

> Initial two lane construction will not disturb Harrington Cobble. With future four lane construction, proper slopes and slope control methods will be employed to insure that construction limits will not infringe on this scenic area. Wild plants that exist there will continue to flourish.

EIS at 49–50.

The court finds specifically that there was a good faith attempt to consider the areas of environmental sensitivity and considerable intrinsic value lying along the proposed construction (exclusive of the Lye Brook backwoods area, to be discussed below in Point III), and that, while an individual botanist or federal judge might have concluded otherwise, there has been no abuse of discretion in this respect; this court cannot say the agency's decision to proceed with construction was "arbitrary or clearly gave insufficient weight to environmental factors." Conservation Council of North Carolina v. Froehlke, *supra,* 473 F.2d at 665; Environmental Defense Fund, Inc. v. Froehlke, *supra,* 473 F.2d at 353.

■ 3. Mention is made of the various alternatives to the proposed action, including doing nothing (not considered feasible owing to the insufficiency of the present highway in safety and other features) (EIS at 5), upgrading of existing Route 7, other alignments and meeting traffic demands through common carrier (bus or rail) means. These alternatives are summarized at Pages 5 and 6 and Pages 65–71 of the EIS, and the court finds that there was a good faith attempt to consider the alternatives and that the determinations of the EIS in this respect are supported by

---

Samplings from watercourses in Vermont and elsewhere indicates that the sheer volume of water involved reduces the soil ion concentrations to very low levels.

EIS at 43 (footnote omitted).

substantial evidence. The only alternative on which evidence was presented was in reference to improvement of existing Route 7, as to which plaintiffs produced evidence by Robert L. Morris, a traffic engineer and transportation planner, on the basis of which the court finds that projections for traffic through 1995 can be handled on a new two-lane road. The court finds, however, that the view of the EIS that reconstruction of the present Route 7 is not feasible is supported by substantial evidence, in that the present Route 7 proceeds through the center of several towns and villages and such reconstruction would not meet current highway design standards. To the extent that the EIS here relates to two-lane construction only, it is, subject to the exceptions above and below set forth, found to be sufficient. Before an additional two lanes may be built, however, a new EIS must be filed, the court finding specifically that the EIS is insufficient to support four-lane construction, within the reasonably foreseeable future since no present need therefor is demonstrated.

■ 4. An analysis of costs and benefits is required by 42 U.S.C. § 4332(2)(C) (iv) and (v). "The complete impact statement must contain more than a catalog of environmental facts, however. The agency must also 'explicate fully its course of inquiry, its analysis and its reasoning.'" Environmental Defense Fund, Inc. v. Froehlke, *supra*, 473 F.2d at 351 (citations omitted). *Cf.* Calvert Cliffs' Coordinating Committee v. AEC, *supra*, 449 F.2d at 1114. *See generally* Note, Evolving Judicial Standards under the Environmental Policy Act and the Challenge of the Alaska Pipeline, 81 Yale L.J. 1592, 1600 (1972). The EIS refers to benefits by "economic gain," by increasing opportunities for people to enjoy the beauty and uniqueness of the environment through greater accessibility to it, and by safety to the public. The court finds that the EIS prediction of "economic gain" to the area by providing for fast, safe and efficient transportation *"through* this

important economic corridor" (emphasis supplied) is not supported by the evidence; there is no showing that any greater number of travelers will stop to patronize local business than do now— indeed, there is every reason to suppose that fewer of them will do so, since they will more speedily pass "through" this corridor. To the extent that the availability of this highway will promote business, industry, vacation homes, or additional population growth in the area of the highway, there is no indication whatsoever in the EIS that such growth will be of economic benefit or will constitute economic gain to the area. The proposed construction is of limited access, and there is no showing that it will increase opportunities for people to enjoy the environment except to the extent that automobile passengers may view scenery at relatively high rates of speed or certain areas off of interchange points may be made slightly more accessible time-wise to tourists or visitors from Vermont, other states or Canada. The court finds, however, that the safety conclusions of the EIS are supported by substantial evidence; the EIS indicates that 90 per cent of the present highway is in the bad to poor safety category.

The Introduction to the EIS which is attached hereto in its entirely as Appendix A does represent a weighing of benefits and losses on the basis of which all highway construction through any area could be justified. These are in many ways legislative considerations which a Vermont legislature might conceivably answer differently in 1973 than it did in 1968 when it adopted No. 379 of the Acts of 1967 Adjourned Session, authorizing the proposed construction. It may be noted, however, that the Vermont legislature has taken steps to regulate economic or population growth in ways other than by calling a halt to highway construction, *e. g.*, by adoption of Act 250, 10 V.S.A. § 6001 et seq. (Supp.1971), regulating land development and permitting local zoning, etc., *see* Walter, The Law of the Land: De-

velopment Legislation in Maine and Ver- mont, 23 Me.L.Rev. 315 (1971), or of Vt.Stat.Anno., Act No. 81 (1973), authorizing capital gains taxes on land sales. Since remand is required for findings to be made by the responsible federal agency, however, a more specific weighing of costs and benefits should ensue, the present EIS containing no reference, for example, to the cost of the highway, and no attempt to place a dollar figure on economic and environmental harm and benefit caused by the highway. Note, Evolving Judicial Standards, *supra,* 81 Yale L.J. at 1600–01.

III. *Whether the Bennington to Manchester segment of highway is part of a larger proposal for an improved Route 7 or "superhighway" in Connecticut, Massachusetts and Vermont so as to require an EIS for the entire length of Route 7, rather than merely for the particular segment here covered.*

Considerable testimony was presented by the defendants from both federal and state highway officials from each of the three involved states that there is no overall plan for the development of Route 7 into a four-lane expressway or superhighway from Norwalk, Connecticut, to Burlington, Vermont. At the same time there is considerable evidence that each of the three states is contemplating or has already constructed an expressway in a number of segments along the Route 7 corridor. In Vermont a Wallingford to Rutland segment has been built, the Bennington-Manchester section and the Wallingford By-Pass are presently planned or programmed, but the segment from Rutland to Burlington is only under study. In Massachusetts except for the Route 7 By-Pass all proposals for Route 7 improvement are temporarily suspended until a regional transportation study is developed by the Berkshire County Regional Planning Commission, but such proposals have been made. In Connecticut there are no

major improvement sections planned north of New Milford, some 40 miles from the Massachusetts border, but south of New Milford construction or planning is in process. *See* Committee to Stop Route 7 v. Volpe, 346 F.Supp. 731 (D.Conn.1972). The court finds that there is no overall federal plan for improvement of the Route 7 corridor in the three states into a divided limited access superhighway. The court finds, however, that each of the three states' highway departments are looking toward this end as possible of accomplishment with legislative and federal approval over a long-range period of time, with federal approval taking place on an ad hoc basis at the division engineer level.[3] The court finds, moreover, on the basis of the testimony of Mr. Morris that the construction of isolated sections along the corridor will induce traffic, tending further to require additional construction beyond presently planned termini. The court further finds that federal highway officials have knowledge of the overall planning process by state officials and to a considerable extent work in "partnership" with state officials in connection therewith, and that each of the three states has from time to time taken advantage of federal highway planning money specifically in connection with Route 7 improvement.

The question then becomes whether under NEPA and the Intergovernmental Cooperation Act, 42 U.S.C. § 4231, an overall EIS may be required at any time, or whether particular segments of a highway may be constructed with an EIS required only as to those segments. This question is plainly one which goes right to the essence of the traditional federal-state highway planning process. It is not unlike, though of considerably less importance on an individual superhighway basis, the question before the United States Court of Appeals for the District of Columbia in the recent breeder-reactor case, Scientists' Institute for

3. The FHWA Vermont division engineer, Mr. Kelley, testified that "We are not dictators, we are salesmen." One may inquire what it is he is "selling."

Public Information, Inc. v. AEC, 481 F. 2d 1079 No. 72–1331 (D.C.Cir., June 12, 1973). There the court recognized that the liquid metal fast breeder reactor program was still in the research and development stage and no specific implementing action which would significantly affect the environment had yet been taken. Nevertheless, it required a detailed NEPA statement in view of the magnitude of the ongoing federal investment in the program, the controversial environmental effects attendant upon future use of breeder reactors, the accelerated pace under which the program has been moving from research to practical implementation, and the manner in which the investment is likely to restrict future alternatives. NEPA itself requires recognition of the "long-range character of environmental problems . . . ." 42 U.S.C. § 4332(2)(E). So, too, the Senate Report indicates that NEPA was designed to prevent the making of "[i]mportant decisions concerning the use and shape of man's future environment . . . in small but steady increments which perpetuate rather than avoid the recognized mistakes of previous decades." S.Rep.No. 91–296, 91st Cong., 1st Sess. 5 (1969), quoted in Scientists' Institute for Public Information v. AEC, *supra*, 481 F.2d at 1090. Seeking to implement the Act, the Council on Environmental Quality (CEQ) has indicated that in certain instances "broad program statements will be appropriate, assessing . . . the overall impact of a . . . chain of contemplated projects . . . ." Memorandum to Federal Agencies on Procedures for Improving Environmental Impact Statements, 3 Env.L.Rep. 82, 87 (1972). Where "irreversible and irretrievable commitments of resources," 42 U.S.C. § 4332(2)(C)(v), have been made in constructing major segments of an expressway along the line of an existing highway route, subsequent NEPA statements for particular segments become, in the words of Calvert Cliffs' Coordinating Committee v. AEC, *supra*, a "hollow exercise." 449 F.2d at 1128. Cf.

Sierra Club v. Froehlke, 359 F.Supp. 1289 (S.D.Tex., Feb. 16, 1973) (EIS for Wallisville Reservoir as part of Trinity River project insufficient; EIS for entire project required). "Super-highways" were cited on the list of modern phenomena threatening the environment as to which legislation had been introduced that was drawn on during the consideration of NEPA. *See* 115 Cong.Rec. 29068 & n. 5 (1969) (statement of Sen. Jackson). An EIS may be of importance, moreover, not just to the decisionmakers within the state highway departments and the federal highway bureaucracy, Monroe County Conservation Council, Inc. v. Volpe, 472 F.2d 693, 697 (2d Cir. 1972), but also to the Congress and the individual state legislatures as well as the public, a purpose of NEPA not to be overlooked. *Cf.* National Resources Defense Council, Inc. v. Morton, 148 U.S.App.D.C. 5, 458 F.2d 827, 833 (1972); Committee for Nuclear Responsibility, Inc. v. Seaborg, 149 U.S.App.D.C. 380, 463 F.2d 783 (1971). *See also* Hanly v. Kleindienst, 471 F.2d 823 (2d Cir. 1972), cert. denied, 412 U.S. 908, 93 S. Ct. 2290, 36 L.Ed.2d 974 (1973); Hanly v. Mitchell, 460 F.2d 640 (2d Cir.), cert. denied, 409 U.S. 990, 93 S.Ct. 313, 34 L.Ed.2d 256 (1972).

Of course an overall EIS for all of Route 7 would have one major consideration in mind, whether a superhighway is environmentally and otherwise the most viable alternative. Since the very agency which would be considering this derives its funds from highway tax money and is committed to the development of "long-range highway plans and programs" under its enabling legislation, 23 U.S.C. § 134(a), however, one would suppose that the ultimate EIS may not be as objectively formulated as might be hoped for. Indeed, one would go so far as to suggest that perhaps the very existence of so-called highway "trust funds," usable only for highway construction and not other forms of mass transportation is in a very fundamental sense inconsistent with the NEPA requirements that other alternatives be considered.

42 U.S.C. § 4332(2)(C)(iii). Be this as it may, we have to deal with the here and now, and here we are once again with environmental consideration entrusted to departments with promotional aims.[4] *Cf.* Morningside Renewal Council, Inc. v. AEC, 482 F.2d 234, at 239 (2d Cir., 1973), (dissenting opinion).

■ On the basis of the court's findings of fact and conclusions of law above set forth, the court would attach a condition to proceeding under the present EIS (if that is permitted by any final order of court) in respect to the Bennington-Manchester segment and the construction of two lanes thereof (hereby expressly found to be needed for local purposes) the filing of an overall EIS by the FHWA in respect to the entire Route 7 corridor within one year from any such final order of court. If this opinion is sustained on appeal, then the FHWA must make an overall impact statement within six months from issuance of the EIS ordered in Section I above. This order is made independently on the additional basis of the requirement of the Intergovernmental Cooperation Act of 1968, 42 U.S.C. § 4231 et seq., that "All viewpoints—national, *regional,* State, and local—shall, to the extent possible, be fully considered and taken into account in planning Federal or federally assisted development programs and projects." 42 U.S.C. § 4231(b) (emphasis supplied).

IV. *Whether there has been compliance with § 4(f) of the DOT Act of 1966, 49 U.S.C. § 1653(f) and 23 U.S.C. § 138.*

Section 4(f) declares it a national policy that special effort shall be made to preserve the natural beauty of the countryside and public park and recreation lands, wildlife and waterfowl refuges and historic sites. After August 23, 1968, the Secretary of Transportation "shall not approve" any project which requires the use of any publicly owned land from such an area if "of national, State, or local significance as determined by the Federal, State, or local officials having jurisdiction thereof" unless there is "no feasible and prudent alternative" and there is all possible planning to "minimize harm."

A substantial section of the Green Mountain National Forest, an area known as the Lye Brook Backwoods Area, lies in Bennington County easterly of Arlington and Manchester. This area of about 11,000 acres is, according to the United States Forest Service Multiple Use Management Plan of February, 1971, "a remote area with no permanent roads and includes Bourne Pond and a portion of the Appalachian Trail." Plaintiff's Ex. 32. "It is," according to the same exhibit, "a special area set aside for those seeking solitude" and is "a place where one can get away in a near natural forest environment to enjoy nature." Legislation was introduced by Vermont's senior Senator and others to declare this a Wild Area, and on October 13, 1972, the Regional Forester advised the Forest Supervisor of the Green Mountain National Forest to place the Lye Brook Backwoods Area "in a 'no development' status" until the outcome of the pending legislation is determined. Plaintiff's Ex. 36. As late as March 7, 1973, the Forest Supervisor indicated that he did not know whether the proposed Route 7 project would actually enter or cross any National Forest land,

---

4. *See* Developments in Environmental Law, 3 E.L.R. 50001, 50008 (1973):
. . . for the most part the agencies which must do the "full good faith" balancing of economic and social costs against environmental costs are generally structured to be advocates for economic expansion. As long as agencies are left to do the balancing, and as long as they have a *dual man-* *date* of environmental protection and economic development in their particular field—for example, power growth for the FPC, nuclear development for the AEC, or flood containment for the Army Corps of Engineers—is not the environment *bound* to come out on the short end?
(Emphasis original.)

although he indicated that it may cross a very small portion of this land along the westernmost boundary of it. Plaintiff's Ex. 37.

■ On the other hand, the EIS contains in Exhibit P letters from the Vermont National Forest Supervisor to the VHD dated December 23, 1970, February 11, 1971, and May 15, 1972, that these lands were for timber production, watershed protection and related activities and that there were as of December 23, 1970, "no recreational facilities contemplated." The Forest Supervisor, Floyd Marita, testified that his office had developed a plan which would locate the western boundary of the wilderness area at the eastern boundary of the proposed highway. To date there has been no determination pursuant to § 4(f) by the National Forest Service. Despite the large amount of acreage in the Lye Brook Backwoods area, such a determination the court rules necessary, regardless whether the western boundary of that area is ultimately fixed administratively or legislatively to be coincident with the easterly boundary of the proposed highway project. As the Ninth Circuit said in Brooks v. Volpe, 460 F.2d 1193, 1194 (9th Cir. 1972), construing the word "use" in the complementary § 18(a) of the Federal-Aid Highway Act of 1968, 23 U.S.C. § 138: "The word 'use' is to be construed broadly in favor of environmental statements in cases in which environmental impact appears to be a substantial question. [Cases cited.] Application of this principle in the present case requires that the encirclement of the Denny Creek Campground by the challenged freeway be recognized as a 'use' of that campground . . . ." So, too, the bordering of the Lye Brook Backwoods Area by a highway would constitute the "use" of that land within the prohibitory meaning of § 4(f) as well as a "use" within the Federal Aid Highway Act of 1968 relied upon by the Ninth Circuit above, which is in the same language and statutorily complementary to § 4(f). Since a new

EIS is ordered in any event, there should be ample time and opportunity to pursue all § 4(f) procedures.

It is ordered that the injunction issued on October 26, 1972, be and it is hereby continued in effect pending receipt of a sufficient environmental impact statement prepared by the responsible federal agency, to wit, the FHWA.

## APPENDIX A

### INTRODUCTION

This is the first Environmental Impack Statement to be prepared for a highway project of major proportions in Vermont.

In its presentation, and in the belief that there will be more such statements developed in the near future, the authors wish to present for consideration, especially to those for whom this represents an initial contact with the state, some general comments which might be construed as peripheral to the normal scope of an environmental impact statement.

Many of these facts and issues will be found in only slightly altered form and detail, at the core of almost every E.I.S. prepared concerning Vermont highways.

The environmental issues raised, particularly, are going to be raised again in other areas because of the marked similarity of terrain and socio-economic pattern that has evolved throughout most of the state.

Vermont encompasses 9,609 square miles of essentially rugged to mountainous terrain. At the time of the Civil War the population was just over 300 thousand individuals, quite generally distributed over the entire area excepting the highest mountain ranges. These people lived on family subsistence farms, a type of farm almost unheard of today. Their entire existence was scratched tenaciously from the boulder strewn soil and land was valuable primarily when something could be grown on it, taken from it, or cattle or sheep could be grazed upon it. If the Vermont Farmer had a beautiful view from his west

mowing of the hazy river valley and the mountains beyond, he scarcely had time to notice or enjoy it because he labored almost constantly through the daylight hours of the short summers to provide for "his own".

At that time the State was scarcely 30% forested, the lowlands having been cleared for agricultural activity and the upper slopes through lumbering operations and the manufacture of lye and charcoal. Many old photos of Vermont communities show these denuded hills. Deer, bear, beaver and some lesser forms of wildlife were on the verge of extinction from relentless pursuit for their meat or hides. However, from the decade preceding the turn of the century through World War I and the "Roaring 20's" a younger generation which sought better things in life than the isolation and privation of the "old place", began a seemingly inexorable migration out of the hills, many away from the state altogether. Indeed, in 1860 98% of Vermonters lived rurally. By the late 1930's that figure had declined to 65.-7%. This mass exodus of over 30% of the population from rural countryside to urban area had a profound effect on the appearance of the terrain. Farm after countless farm followed in death the faithful hands that had cultivated it. The forests, always ready to reinvade in the absence of mower or cultivator, crept across pasture, then meadow, finally to bury decaying house and barn in tangles of foliage. Wildlife species, with management and exposed to an abundance of new cover, again flourished. Now, in the 1970's a State once 60-odd percent open has become 70-odd percent forested and though the population has grown to almost 445,000 (somewhat less than the City of Denver, Colorado) it still has the third from lowest population of any state in the nation (statistical density of 21.6 persons per square mile). The comparatively few surviving farms are now dairy or fruit producers and the economy has swung strongly toward tourism. Along with moderate commercial and light industrial activity, finan-

cial interests from outside the State have created ski areas on many of the peaks, while lodges, condominiums and seasonal dwellings sprout around their bases. The old farmsteads, so recently abandoned by their sons and daughters are now being eagerly sought by strangers, not as farms but for homes. Developers are riding a tide of retirees and escapees from the large cities who have suddenly discovered that these seemingly endless cool green valleys offer quiet and solace and may, perchance, be one of the last bastions of the individualist, the really free man.

The foregoing is intended to illustrate two things; one, the unique combination of heritage and present activity that has created the Vermont of the 1970's and two, that our natural environment has changed radically in the past seventy years, is changing every day and, in all likelihood, will continue to change again as radically in the next half hundred years. In this respect, we have neither inherited an untarnished environment, unchanged and unchanging, from ages past, nor are we destined to pass it on unmarked by our own needs and use.

No argument here with the naturalist who rushes to defend his wetland and wood; no argument with the barrister who decries the visual and emotional hurt of his client at the hands of "progress"; no argument with those who seek to cherish and conserve the incredible beauty which they so recently have discovered.

This, is the very heart and core of the whole problem. Vermont is beautiful, breathtakingly so at all seasons and in all her guises. Scarcely an acre exists anywhere in the whole state which could not be described as encompassing some intrinsic beauty.

As for the highway project in question, the whole point is that there is no other "more acceptable" alignment somewhere else for a location of this needed and required highway. The very narrow Vermont valley through which the corridor is forced to run possesses every

bit the beauty, the flora, the fauna on its western slopes as on its eastern slopes. Every man has his special site, his favorite stream or his quiet forest glade. Unfortunately, there is no alignment, east or west, which can possibly avoid all those things held in individual high esteem by our citizens. If the easterly side is spared, then the westerly side is not—one group of distressed individuals traded for another.

So many people, abraded raw from years of an urban existence, upon acquiring proprietorship and citizenship in this rural atmosphere have also acquired a strongly defensive and protective attitude toward their new surroundings (and rightly so). Nevertheless, Vermont has a tradition of accommodating the newcomer. Except for the elements, the State has always offered a politely reserved hospitality. Are we now about to erect a portcullis at every entrance? Are we to refuse tens and tens of uncounted thousands of visitors and residents alike the amenity of decent automotive transportation? Are we to continue to subject ourselves and our guests to a witless spectre of carnage of our deficient highways tantamount to deliberate murder?

The real issue is not "does a better line exist", it is, "will the highway be built at all."

Only a little over one percent of the State's total area is presently dedicated to highway purposes. That includes all city and village streets and all town highways, as well as the entire State Highway System. And of the fourteen counties in the State, Bennington County is second only to Essex in having the lowest highway mileage per square mile of area. The additional mileage contemplated would change that value only an imperceptible fraction. From its centerline the highway naturally bulks large in perspective, but from several hundred feet away this highway would be visually lost in the woods.

In the construction of 320 miles of interstate highway from Vermont-Massachusetts Border up the Connecticut River, across Central Vermont, and northerly through the Champlain Valley to the Canadian Line through some of the most incredibly spectacular scenery, natural areas, rural and urban settings, the equal of, in every respect, the Bennington area, no one has come forth to decry any resulting overwhelming damage, irreversible commitment of resources, destruction of unique or fragile areas, or the like. This is not to say that there has been no damage at all, but it does seem to verify that degradation of the human or natural environment is not a serious or significant problem attending highway construction through rural or remote areas. The overwhelming benefits have been recognized by almost everyone familiar with the old route.

If an alternative exists it is basically the alternative of sacrificing the explicitly human environment (homes, businesses, community values, etc.) which are strongly polarized along the existing US 7 corridor as opposed to minimal use of the natural or remote areas which closely border it on both sides.

Twenty-two million people live in a belt approximately 50 miles wide stretching along the Atlantic Coast from the northerly limits of the greater Boston metropolitan area to central New Jersey. As the ravenous demands of urbanization consume the already meager reserves of open space in that belt, that mass of humanity is going to be forced further and further afield in ever increasing numbers in recreational pursuits and for part time and full time living accommodations. Either we plan and build our transportation system now to accommodate this increase or we shall face greater congestion in the future. Vermont may well, like it or not, become the one major four season recreational and rural living center for the entire northeast. The natural and scenic areas, the Beaver Meadows and all the rest hanging in the balance which the public needs so desperately today, may well have been quietly nibbled away by private interests. As a matter of pre-

cise fact, to demonstrate this point, a commercial housing development is presently underway immediately adjacent to the northern perimeter of the Beaver Meadows flowage. More harm to the sanctuary of beaver dams and unique surroundings may generate from this activity than from any highway project.

All of the areas over which objections have been raised, except for a few acres of Green Mountain National Forest, are presently on private property and subject to the decision of the owner. Only the Fayville Branch reasonably could be forever saved for public appreciation since it is within the National Forest authorized acquisition area. But the "Cobbles" and the beaver dams are someone's "backyard" and, delightful as they may be to any hiker, naturalist, or whomever, there is presently no actual legal public access to them, nor any indication that such is likely. · This in no way is to detract from their sundry values but the denial of a partial use of them for highway purposes, under the cloak that this will, in some way, preserve them for future generations is not believed to be an entirely valid line of reasoning.

However, that state of our present biota that the uninitiated or casual observer sees, and interprets as a static condition, something to be grasped and preserved for all time is, in a broader temporal sense, a most transitory thing. The true naturalist not only sees todays bionemic system but, in addition, easily translates it into yesterday and tomorrow. That Robert Frost saw here a profusion of basil, thyme and columbine, ragwort, mint and others we may most assuredly assume from the content of his measured cadences. That he saw them in exactly the same places that we do, as our romantic nostalgia wants us to believe, is highly unlikely. Nature is a brutal parent and the tender green shoots she so carefully nurtures one day she smothers the next. The kind of trees that are found along the proposed line, their distribution, and their ages all indicate the radical change that has

taken place in ground cover and land use just within the last thirty years. The entire area of the cobbles, with the exception of a stand of heavy old sugar maples, was completely open pasture with nothing more than our rank native grasses for cover. Within another thirty years most of the light loving low growth found there now will be shut off from sky by the maturing forest canopy and will disappear, to be replaced by those species which find the humid shade a boon. And is there significance in the loss of the initial invaders? Hardly; they flourish again in their own, reckless profusion of color, shape and smell on the other side of the hill where the loggers worked, down the ridge where the developer cleared, across the valley where the forest burned, etc.