**The CONSERVATION SOCIETY OF SOUTHERN VERMONT et al.,**

v.

**SECRETARY OF TRANSPORTATION et al.**

**Civ. A. No. 6598.**

United States District Court, D. Vermont.

Jan. 19, 1978.

Harvey D. Carter, Jr., of Witten & Carter, Bennington, Vt., for plaintiffs.

Robert Schwartz, Deputy Atty. Gen., Montpelier, Vt., for the Vermont Highway Dept.

William B. Gray, U. S. Atty., and Richard H. Thomas, Dept. of Transp., Albany, N.Y., for the United States.

Arthur J. O'Dea, Manchester Center, Vt., for the amici curiae.

FINDINGS OF FACT, CONCLUSIONS OF LAW and OPINION on MOTION OF DEFENDANTS TO DISSOLVE INJUNCTION

OAKES, Circuit Judge, Sitting by Designation.

This matter again came on for hearing on November 10, 1977,[1] when the federal and

---

1. The Conservation Society of Southern Vermont was permitted to withdraw as plaintiff at this time. The remaining plaintiffs are Ruth and Lawrence Wasco and Leon Eldred.

state defendants moved to dissolve an injunction issued on October 26, 1972, *see Conservation Society of Southern Vermont, Inc. v. Volpe,* 343 F.Supp. 761 (D.Vt.1972), which remained

> in full force and effect until a good and sufficient Section 4(f) statement is filed with and approved by the court.

*Conservation Society of Southern Vermont, Inc. v. Secretary of Transportation,* No. 6598, at 8 (D.Vt. July 26, 1977). The basis for defendants' motion is that the Section 4(f) statement filed with this court on August 23, 1977, meets the requirements of Section 4(f) of the Department of Transportation Act of 1966, 49 U.S.C. § 1653(f) and of Section 138 of the Federal-Aid Highway Act of 1968, 23 U.S.C. § 138.[2]

## RECAPITULATION

The lengthy prior proceedings in this case[3] began when the Vermont Highway Department, with the approval of the United States Department of Transportation, proposed a four-lane highway project involving U.S. Route 7. A new highway extending from Bennington, Vermont, to Manchester, Vermont, was contemplated. It has been referred to throughout the litigation in terms of its three component projects, F 019–1(8) (Project 8), F 019–1(9) (Project 9), and F 019–1(10) (Project 10). Project 9 is the subject of the current proceedings.

On October 26, 1972, this court enjoined the defendants from proceeding with the project until a final environmental impact statement (EIS) required by the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4332(2)(C), was filed, and the requirements of Section 4(f) of the Department of Transportation Act of 1966, 49 U.S.C. § 1653(f), and of Section 138 of the Federal-Aid Highway Act of 1968, 23 U.S.C. § 138, were met. *See Conservation Society of Southern Vermont, Inc. v. Volpe, supra,* 343 F.Supp. at 766, 768.

After the EIS was filed, on July 27, 1973, this court refused to dissolve the injunction on a number of grounds, including defendants' failure to comply with the requirements of Section 4(f). *Conservation Society of Southern Vermont, Inc. v. Secretary of Transportation,* 362 F.Supp. 627, 638–39 (D.Vt.1973), *aff'd,* 508 F.2d 927 (2d Cir. 1974), *affirmance vacated & remanded sub nom., Coleman v. Conservation Society of Southern Vermont, Inc.,* 423 U.S. 809, 96 S.Ct. 19, 46 L.Ed.2d 29 (1975), *rev'd,* 531 F.2d 637 (2d Cir. 1976). Appeals followed culminating in the reversal of that portion of the July 27, 1973, decision dealing with Vermont Highway Department preparation of the NEPA-required EIS and the necessity of a regional EIS. The propriety of the Section 4(f) determination was not considered in any of the subsequent proceedings. Nor was the propriety of the court's rulings that approval of the NEPA EIS was limited to two-lane construction only and that the EIS was "insufficient to support four-lane construction, within the reasonably foreseeable future since no present need therefor is demonstrated." 362 F.Supp. at 635.

In an order of June 7, 1977, this court held that its injunction of October 26, 1972, had not been dissolved in full by the court of appeals' reversal, 531 F.2d 637, but remained binding on defendants with regard to Section 4(f) compliance, *Conservation Society of Southern Vermont, Inc. v. Secretary of Transportation,* No. 6598, at 2–3 (D.Vt. June 7, 1977), as well as with respect to the two-lane limitation.

▮ Section 4(f) was originally implicated because Project 9 is to border what in 1973 was known as the Lye Brook Backwoods area. That area consists of approximately 11,000 acres, constituting a substantial portion of the Green Mountain National

---

**2.** Both sections, in relevant part, prohibit the Secretary of Transportation from approving any project requiring the use of specified publicly owned land, including park land, unless there is no feasible and prudent alternative to the use and the project includes all possible planning to minimize harm to the land. These identical provisions will be referred to jointly as Section 4(f).

**3.** Only those proceedings bearing on the issues now before the court will be summarized below.

Forest. At the time of this court's July 27, 1973, opinion legislation had been introduced in Congress to declare Lye Brook a wilderness area, and it had been placed by the United States Forest Service in a "no development" status. Since then, by act of Congress, it has become the Lye Brook Wilderness area. Pub.L. No. 93–622, § 3(a)(11), 88 Stat. 2097 (1975). Both in the opinion of this court, *Conservation Society of Southern Vermont, Inc. v. Secretary of Transportation, supra,* 362 F.Supp. at 639, and by designation of the Forest Service in January, 1976, the close proximity of the proposed highway project to the Lye Brook Wilderness area constitutes a "use" of publicly owned recreation land as defined in Section 4(f). *Accord, Monroe County Conservation Council, Inc. v. Adams,* No. 77–6129, 566 F.2d 419 at 424 (2d Cir., 1977).

It was not until August, 1976, that a draft supplemental EIS under Section 4(f) was prepared and distributed. Thereafter a final supplemental 4(f) EIS was prepared. It was executed by the appropriate United States Department of Transportation authorities on July 20, 1977, and its availability was published in the Federal Register on July 29, 1977.

On July 26, 1977, this court dissolved its injunction precluding construction of Projects 8 and 10 in two-lane form. It was held that these projects were severable from Project 9 for Section 4(f) purposes because only Project 9 is adjacent to the Lye Brook Wilderness area. It was further determined that Projects 8 and 10 would be usable even if Project 9 were not built. Project 9, however, remained enjoined, pending approval by this court of a valid, final 4(f) statement. *Conservation Society of Southern Vermont, Inc. v. Secretary of Transportation, supra,* No. 6598 at 5–6, 8.

The validity of the final 4(f) statement with regard to Project 9 is now before the court. Pursuant to this court's order on motion for rehearing dated August 23, 1977, *Conservation Society of Southern Vermont, Inc. v. Secretary of Transportation,* No. 6598 (D.Vt. Aug. 23, 1977), the Section 4(f) statement previously filed with the court is treated as filed as of August 23, 1977. More than thirty days have elapsed since the final 4(f) statement was made available to the Council on Environmental Quality, commenting agencies and the public, in accordance with Paragraph 6(e) of the Federal Aid Highway Program Manual 7–7–2. *See* letter from David B. Kelly, Division Administrator, to Ronald E. W. Crisman, Acting Commissioner, Vermont Department of Highways (Sept. 2, 1977) (Exhibit 1 to State Defendants' Motion to Dissolve Injunction and Memorandum of Law in Support Thereof, dated Sept. 20, 1977). The matter is thus ripe for consideration at this time.

On November 10, 1977, testimony was taken from witnesses called by the plaintiffs, Joseph Landry, State Highway Department Transportation Plannings and Programs Engineer; Arthur J. Goss, Chief of Design of the Vermont Agency of Transportation; David B. Kelly, Division Administrator of the Federal Highway Administration for the State of Vermont; and Robert L. Morris, a highway transportation planner. Gordon MacArthur, Traffic Research Engineer for the Vermont Agency of Transportation, testified for defendants on rebuttal. On the basis of the testimony, the exhibits and the entire record, this court makes the following findings of fact.

## FINDINGS OF FACT

1. Project 9 involves the acquisition of a right of way for a four-lane, limited-access, divided highway, extending from Sunderland, Vermont, northerly approximately ten miles to its junction with Vermont State Route 11, east of Manchester Center, Vermont, with initial construction of only two lanes proposed and permissible, absent another NEPA EIS and 4(f) statement, under the prior orders and decisions of the court.

2. The final Section 4(f) statement was duly circulated to federal, state and local agencies, officials and individuals.[4]

---

4. The court notes that the proposed alignment is supported by the Bennington County Regional Planning Commission and by the various towns affected by the construction plans, including Manchester, Sunderland and Arlington, all amici curiae.

3. The court finds that there has been substantial compliance with the requirement that the proposed two-lane construction and four-lane right of way acquisition minimize environmental harm. The authorities have carefully selected the precise location of construction along the right of way, with the goal of reducing noise impacts on the Wilderness area. The original 4(f) statement proposed construction along the easterly portion of the right of way. The final proposal envisions construction along the westerly side of the right of way. This change in alignment of the proposed two-lane construction resulted from the United States Department of Transportation's review of the final 4(f) statement. It was made for the purpose of "alleviat[ing] somewhat the noise impact from Route 7 on the Lye Brook Wilderness [area]," Final Supplemental EIS § 4(f) Statement, Addendum, at 1, because the highway will be located 200 to 300 feet further away from the Wilderness boundary under the new proposal. The additional 200 to 300 feet of wooded area between the highway and the Wilderness area will, it is now estimated, provide sufficient noise attenuation to reduce noise within the Wilderness to a level meeting FHWA's noise level standards. *Id.* This court duly notes that "[t]his adjustment in the project plans appears to be a necessary measure to minimize harm to the wilderness, in compliance with the requirements of section 4(f)." *Id.* Implicitly, then, construction of two lanes on the easterly portion of the right of way would both fail to minimize harm to the Wilderness and fail to meet noise level standards within the Wilderness area.[5]

Additional aspects of the proposal will serve to minimize environmental harm. Although the project calls for acquisition of thirty-six acres of National Forest land, these are not Section 4(f) lands. The scenic views along the proposed alignment will be magnificent, while the visual impact of the highway on the Lye Brook Wilderness area will be minimized by the highway's location on a shelf below "The Burning." Landscaping projects have been added to prevent erosion, enhance the view from the road and, most importantly, to screen the highway from the Wilderness area. In addition, no overhead utility lines will be permitted along the highway. Limited access will both prevent strip development along the highway and protect the natural integrity of the area.[6] No known historic sites will be affected by the proposed alignment. Similarly, a survey by an archaeological reconnaissance group indicates that archaeological resources will probably not be encountered since the terrain along the proposed route is topographically unsuited for habitation. As is often the case in Vermont, however, wildlife crossing the highway may present a problem. But according to the Forest Service, most of the deer in the area stay in the higher country to the east and do not migrate through the area of the proposed highway. It is estimated that air pollution will be minimal. The impact on water resources of the Wilderness area will also be negligible because most of the Wilderness area is at an elevation higher than the proposed highway. Finally, adverse environmental impacts during the construction period will be minimized by adherence to the "General Specifications for Highway and Bridge Construction" established by Vermont's Department of Highways.

4. The court further finds that the 4(f) statement sufficiently considered the possibility of prudent and feasible alternates to the proposed alignment, including doing

---

**5.** While the addendum to the 4(f) statement states that "[a]t such time as the traffic demand increases to a point that a four-lane facility is required, the [two additional] lanes would be constructed immediately adjacent to the wilderness area boundary," Final Supplemental EIS § 4(f) Statement at 2, the injunction of this court has been, is and remains in effect against any four-lane construction between Bennington and Manchester under any of the proposed highway projects until a proper EIS under NEPA *and* a Section 4(f) statement pertaining to such four-lane construction have been filed. Concededly, such "construction is not likely to be needed for at least several years . . . ." *Id. See also* 362 F.Supp. at 635.

**6.** Fencing of the right-of-way line between the access points will also help to prevent illegal vehicle entry into the Wilderness area.

nothing, improving existing Route 7, constructing the highway at any one of three alternate locations, and utilizing alternate means of transportation such as passenger trains and buses. There is substantial evidence to support the conclusion of the 4(f) statement that these alternatives are not prudent or feasible.

A. The "no-build" alternate is unacceptable because it fails to provide necessary safe and efficient traffic service. (1) Present Route 7 is too narrow (width of eighteen feet of traveled-way as compared to the proposed width of twenty-four feet) with approximately twelve curves in the ten miles of highway involved greater than the five degrees desirable standard, and a maximum grade of 7.3%, also more than desirable. (2) The present narrow, winding, rolling alignment increases traffic hazards, as indicated by the 231 accidents including two fatalities over the five-year period 1971–75. This accident rate is more than double that experienced on rural highways up to standards consistent with the proposed construction. (3) Highway sufficiency ratings covering safety, service and condition of the existing highway are "bad." (4) Despite the energy crisis, 1977 was the busiest traffic year ever on Route 7, which is used not only by residents for business and pleasure but by tourists wishing to view the scenic grandeur of southwestern Vermont and to engage in other recreational activities. (5) Traffic volumes are expected to increase by 38% by 1995. This increase in traffic demand would result in greater safety hazards and increasing deterioration of the inadequate sections of the present highway.

B. While improvement of existing Route 7 is perhaps the most feasible alternative to the proposed construction,[7] there is substantial evidence supporting the 4(f) statement and militating against implementation of a reconstruction plan. (1) Current State Highway Department requirements concerning the appropriate widths of rights of way could not be met by reconstruction. (2) Any significant improvement of Route 7 would both disrupt traffic flow during construction and result in considerable inconvenience to residences, businesses and historic sites located along the present highway. (3) If the highway remained a non-limited access facility as it would for all practical purposes have to remain, (a) adequate future highway safety could not be ensured since the roadway would still traverse the towns and settlements located along Route 7; (b) reducing accident potential would necessitate at a minimum an additional lane or similar device to accommodate left-turn vehicles, with a corresponding need to acquire greater amounts of land from adjacent property, including, possibly, certain historic sites; and (3) it is unclear whether even an improved facility could accommodate projected future traffic volume. (4) Although a limited access highway would alleviate some of these safety hazards, it would be economically disastrous to those enterprises presently located along the highway and would create serious practical problems for the persons in homes adjacent to the highway.

C. While the alternate locations for the new highway would avoid contact with the Lye Brook Wilderness area, there is substantial evidence to support the finding of the 4(f) statement that each of these alternate routes would engender even more severe unavoidable environmental impacts. (1) An alternate line on the west side of U.S. Route 7 would likely damage sensitive areas in the corridor between Equinox Mountain and present Route 7.[8] It would

---

7. Mr. Morris testified to the feasibility of improving present Route 7. He indicated that certain dangerous curves could be straightened, additional lanes could be built for passing traffic, and other improvements could be made to raise the safety and efficiency of the highway. He though that it might be possible to bypass part of the town of Arlington.

The court notes, however, that Mr. Morris' conclusions were primarily in terms of general-

ities, based on his having traveled Route 7 four times. He took no measurements, made no traffic surveys or conceptual designs, and never drove on the highway during the snow season.

8. The western alignment could adversely affect, to name a few locations, Cook Hollow, a unique geological area, three watershed areas supplying the Manchester water system, and Equinox Pond.

also necessitate crossing the Batten Kill, a nationally renowned trout stream and an invaluable recreational resource in Vermont. (2) An alternate line on the east side of the valley between the proposed location and the National Forest boundary would similarly not be practical due to potential adverse impacts on the Batten Kill and physical restrictions necessitating construction along a steep slope.[9] (3) Similarly, as explained by the 4(f) statement and by plaintiffs' witnesses on cross-examination, to construct an alternate line between existing Route 7 and the Vermont Railway would again involve the Batten Kill and its floodplain, requiring at least two crossings of both the Batten Kill and the Vermont Railway.[10] Furthermore, this route would require the purchase of agricultural and residential properties as well as termination or bridging of at least three local roads.

D. Finally, the court finds that the use of alternate modes of travel would not sufficiently reduce traffic demands on Route 7 to alter significantly the scope of the needed highway improvement. Operation of a large-scale mass transit system is not feasible given the scattered population base of the area, the diversity of origins and destinations and the propensities of the traveling public in the area.

■ 5. The Section 4(f) statement, as revised by the addendum, see Finding 3 supra, is proper and sufficient. It contains an accurate description and history of the proposed action and considers alternatives and means of minimizing environmental harm. The summary of environmental impacts is complete and accurate with the exception of the statement that "[n]oise levels will meet FHWA Design Standards if the roadway is widened to four lanes by the design year." Final Supplemental EIS § 4(f) Statement at 6. This conclusion is inconsistent with the most recent finding in

the addendum, see Finding 3 supra, and is rejected as based on insufficient evidence.

## CONCLUSIONS OF LAW AND OPINION

The role of a district court in reviewing the sufficiency of a 4(f) statement has recently been set forth by the Second Circuit Court of Appeals:

Insofar as the 4(f) Statement is concerned, the district court must ascertain first whether the Secretary of Transportation acted within the scope of his authority, i. e., whether the Secretary could have reasonably believed that there were no feasible alternatives to the use of parklands or that the alternatives involved unique problems. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). The court, without substituting its own judgment for that of the agency, must then determine that the choice made was not arbitrary, capricious, an abuse of discretion or a violation of law. *Id.* Finally, the court must satisfy itself that the correct procedures have been followed in arriving at the decision under review. *Id.* at 417, 91 S.Ct. 814.

The burden of proof is on the challenging plaintiff to establish . . . that the Secretary of Transportation had acted improperly in approving the use of parklands. *Sierra Club v. Morton, supra*, 510 F.2d at 818; *Sierra Club v. Callaway*, 499 F.2d 982, 992 (5th Cir. 1974).

*Monroe County Conservation Council, Inc. v. Adams, supra*, No. 77–6129, 566 F.2d 419 at 422.

■ This court is satisfied that in choosing the proposed alignment the responsible authorities analyzed in good faith and in a reasonably comprehensive manner the various alternatives. There is substantial evi-

---

**9.** A slight relocation of this alternate route to the west might minimize, to some extent, harm to the Batten Kill. However, it would necessitate the acquisition, at excessive costs, of a five-mile strip of privately owned land which would be landlocked by the highway.

**10.** In addition to the two crossings, which would require channel work with a direct impact on the river, the highway would be located adjacent to the river at certain points. Construction at these conflict points could have a detrimental effect on aquatic life, particularly on the trout population, a very important natural resource of the area.

dence in the record supporting their conclusion: that these alternative plans are not feasible or prudent. Furthermore, the administrative decision was not arbitrary, capricious or a clear abuse of discretion, as demonstrated by the considerable amount of planning to minimize harm to the Wilderness area. Finally, there is nothing in the record to indicate non-compliance with the requisite procedures.

Accordingly, the injunction is modified to permit acquisition of a four-lane right of way and construction of a two-lane highway along the westerly portion of the right of way, in accordance with the proposal set forth in the addendum to the 4(f) statement. The parties are to submit proposed decrees within twenty days. No costs.