**NO EAST–WEST HIGHWAY COMMITTEE, INC.**

v.

**Robert H. WHITAKER, as New Hampshire Highway Commissioner, et al.**

**Civ. A. No. 73–199.**

United States District Court,
D. New Hampshire.

Oct. 17, 1975.

Robert A. Backus, Devine, Millimet, Stahl & Branch, Manchester, N. H., Haynes N. Johnson, Bryan, Parmelee, Johnson & Bollinger, Stamford, Conn., for plaintiff.

John C. Boeckeler, Asst. Atty. Gen., Concord, N. H., Gary Randall, Land & Natural Resources Div., General Litigation Section, Dept. of Justice, Washington, D. C., for defendants.

## OPINION

BOWNES, District Judge.

Plaintiff alleges that the defendants are planning to construct a four-lane east-west limited access highway from the Connecticut River to the Merrimack River in contravention of various federal environmental statutes.[1] National Environmental Policy Act of 1969, 42 U.S.C. § 4321 et seq. (NEPA); the Intergovernmental Cooperation Act of 1968, as amended, 42 U.S.C. § 4231 et seq. (ICA); and the Federal Aid Highway Act, as amended, 23 U.S.C. §§ 109(h), 128, and 138. Jurisdiction is pursuant to 5 U.S.C. §§ 701–706 and 28 U.S.C. § 1331.

Plaintiff contends that the incremental construction of four federally funded highway projects along New Hampshire Route 101, in conjunction with the commitment to construct a bypass in Milford, New Hampshire, which coincides with the recommendations contained in a State study for an east-west highway, constitutes a plan to construct a new four-lane east-west limited access highway in southern New Hampshire. Plaintiff further contends that the alleged plan is a "major Federal action," requiring the preparation of an Environmental Impact Statement (EIS) for the entire route corridor.

Defendants contend that there is no overall State or Federal plan to construct or relocate a new east-west highway, and

---

1. Plaintiff is a nonprofit corporation comprised of approximately one thousand persons. Defendants have stipulated that plaintiff has standing to maintain this suit.
Defendants are: Robert H. Whitaker, Commissioner of the New Hamphire Department of Public Works and Highways; F. T. Comstock, Jr., Federal Highway Administrator, Division Engineer; Robert E. Kirby, Regional Federal Highway Administrator; and William T. Coleman, Jr., Secretary of Transportation.

that they have no legal duty to prepare an EIS for a study which is subject to extensive modification.

## ISSUES

The following issues are presented to the court:

1. When does a preliminary highway route location study become a plan, recommendation or proposal to construct necessitating the preparation of an EIS for the entire route; and

2. Whether federal participation in the incremental stage construction of bypasses and widening of an existing highway, in accord with the State funded engineering study that recommends such construction as part of a new east-west highway, in conjunction with the use of Federal highway planning, research, and development funds, constitutes a "major Federal action" requiring the preparation of an EIS for the entire route.

## RELIEF SOUGHT

Plaintiffs seeks a declaratory judgment that the defendants are planning or designing a new east-west highway for southern New Hampshire in the vicinity of the existing Route 9—Route 101 corridor. (Route Corridor) In addition, plaintiff seeks to permanently enjoin the defendants from financing, planning, designing or constructing any portion of the new east-west highway pending the completion and approval of an EIS which considers the intrinsic environmental impact that route construction or relocation will have on the entire Route Corridor.

A hearing on the merits, pursuant to Fed.R.Civ.P. 65(a)(2), was held on August 7 and 8, 1975.

## GEOGRAPHIC LOCATIONS OF THE AREAS IN QUESTION

Route 9 is an east-west route beginning at the Vermont border, on the Connecticut River, in the vicinity of Brattleboro, and runs in an easterly direction to Keene, New Hampshire. At Keene, Route 9 terminates and, in effect, connects with Route 101, so that traffic traveling along Route 9 in an easterly direction can bypass Keene and continue unimpeded in an easterly direction.[2]

Route 101 is, for the most part, on the Federal-aid primary system. It extends from Keene in the west to Portsmouth in the east and passes around or through the cities, towns or villages of Keene, Marlboro, Dublin, Peterborough, Wilton, Amherst, Bedford, Manchester, Raymond, Epping, and Exeter. At Manchester, Route 101 intersects with the F. E. Everett Turnpike and Interstate Route I-93.[3]

West of the F. E. Everett Turnpike, along the route in question, "Route 101 is primarily a two-lane highway having four-lane limited access right-of-way portions, within which only two lanes have been constructed." (Stipulation No. 4) Construction has occurred in the areas "of Amherst-Milford, the Hillsborough-Cheshire county lines near Bonds Corners [sic] and Keene." (Stipulation No. 4)

The Route Corridor is the principal east-west highway in southern New Hampshire, serving local traffic, through traffic, interurban traffic (e. g., Keene to Nashua-Manchester), and interstate traffic. Route 9 intersects with I-91, a north-south interstate highway in Ver-

2. George Harris, Assistant Planning and Economics Engineer for the New Hampshire Department of Public Works and Highways, testified that the State has acquired the rights-of-way for expanding the Keene interchange into a four-lane divided highway. (Harris Testimony, Tr. at 112) It should be noted that the Keene "interchange location was not a part of the FST Study, did not result from the FST Study, and was not a part of any of the Department's preliminary studies for the improvement of Route 101." (Stipulation No. 19)

3. I-93 is a north-south interstate highway that links the megalopolis areas of the East Coast. The F. E. Everett Turnpike is a north-south four-lane divided highway which parallels I-93 from Nashua to Concord.

mont, right next to the New Hampshire border; Route 101 intersects with I-93, a north-south interstate highway in southern New Hampshire. Both I-91 and I-93 connect with the interstate system running along the Eastern Seaboard of the United States.

## THE ROUTES 9—101 CORRIDOR STUDIES

### Fay, Spofford, and Thorndike

In May, 1960, the New Hampshire Department of Public Works and Highways commissioned the consultant firm of Fay, Spofford, and Thorndike (FST) to prepare an engineering study and design report for the relocation of Route 101 as a limited access highway, on a new right-of-way, from Keene to a point on the F. E. Everett Turnpike near Thornton's Ferry. (Pl.'s Ex. 12-5) The FST Study was financed solely by State funds.

In 1962, FST presented to the NHDPW&H a study entitled "Design Report for the Relocation of Route 101, Keene to Merrimack." FST Study, Pl.'s Ex. 4-3) The FST Study concluded that "[t]here will be definite need in the foreseeable future for a four-lane divided highway from Keene to a point on the F. E. Everett Turnpike between Manchester and Nashua." Id. at 8.

In order to attain the goal of route relocation or reconstruction, while at the same time improving the most deficient portions of Route 101, the Study proposed a "stage construction program." The program suggested an order of construction by listing numerically, according to their priority, ten stages of construction. (Pl.'s Ex. 5-18) The FST Study stated that "[t]he completion of the stage construction . . . will provide a complete workable facility from Keene to Merrimack and high-type connections to points north and south via the F. E. Everett Turnpike." (Pl.'s Ex. 4-3, App. at 5)

In regard to the present status of the first four FST priorities, the parties have stipulated as follows:

The FST "Recommended Order of Stage Construction" describes ten numbered priorities. Projects for the improvement of Route 101 which are similar to parts of the first four priority recommendations of the FST study have been completed. Improvements of Route 101 which are substantially in the routes as shown by the recommendations of the FST study have been completed. Improvements of Route 101 which are substantially in the routes as shown by the recommendations of the FST study have been constructed in the areas of Milford and Amherst, Bonds Corners [sic] on the Cheshire-Hillsborough county lines and in Keene and are shown in red on [Pl.'s Ex. 7-20]. (Stipulation No. 16)

The parties have also stipulated that the State is presently planning the construction of the Milford bypass in the Wilton area as was suggested in FST's Priority No. 4. (Stipulation No. 17)

Concerning FST Priority No. 5, the parties stipulated as follows:

Priority No. 5 of the FST study recommended a relocation of Route 101 from Marlborough to a point near existing Route 101 at the Hillsborough-Cheshire county line in the Dublin area. Studies for improvement of Route 101 in the Dublin area are now taking place and include a line substantially corresponding to one shown in the FST report, several other lines not shown in the FST report, and the possibility of no improvement at all. (Stipulation No. 18; *see also Dublin Construction, infra*)

The FST Study still continues to be used "as a source of information to portions of Route 101 from Keene to Bedford by the Planning and Economics Division of the New Hampshire Department of Public Works and Highways." (Stipulation No. 15) The FST Study has not, however, been submitted to the Federal Works and Highways Administration (FHWA) for either their comment or approval.

*1968 National Highway Classification*

In 1969, pursuant to Section 17 of the Federal Aid Highway Act of 1968, the NHDPW&H inventoried the State's highway system and functionally classified all state highways. As a consequence of this program, the Route 9—Route 101 corridor was classified as a "principal arterial" [4] highway having as its primary purpose the movement of automobile traffic which has "characteristics indicative of substantial statewide or interstate travel." (Defts.' Ex. 27–50 at II-10) "This principal arterial corridor is the only one running east-west in southern New Hampshire between the Connecticut River and the Merrimack River." (Stipulation No. 11)

It should be noted that the functional classification of the Route Corridor as a "principal arterial" highway was "for study purposes only and in no way represent[s] a commitment or policy change by the Department of Transportation, the State's, or the local participating units of government." (Defts.' Ex. 28–51 at I–2)

*1972 National Transportation Needs Study*

In 1971, the NHDPW&H, pursuant to Section 121(a) of the Federal Aid Highway Act of 1970, prepared a "Needs Study" which projected New Hampshire's highway needs to the year 1990. On the basis of these projections, the NHDPW&H recommended the functional realignment of the State's highways.

As part of the Needs Study, and with a predictive eye to the future, the NHDPW&H prepared, in late 1970, a Functional Classification Study map. (Pl's. Ex. 16–12) This map discloses an intent to relocate Route 101 from Milford to the F. E. Everett Turnpike. This relocated portion of Route 101 "corresponds substantially to the general location of the recommended relocation of Route 101" as suggested in the FST Study. (Stipulation No. 24)

The 1990 maps, showing anticipated traffic needs at both high and low federal funding, projected the construction of a four-lane limited access highway from Keene to the F. E. Everett Turnpike. (Pl.'s Ex. 25–35e and f) These maps were prepared in conformity with manuals issued by the United States Department of Transportation. (Pl's. Ex. 28–51) After being prepared by the State, the maps were then forwarded to the New Hampshire Division of the FHWA to determine whether they conformed with the "criteria and guidelines set forth in the [federal] manuals for the national study." (Testimony of Frederick Comstock, Division Engineer for the New Hampshire Division of the FHWA, Tr. at 296)

Like the 1968 Study, the design standards used in the "Needs Study" did not represent a State commitment or plan to construct the projected highways. (Defts'. Ex. 28–51 at I–2)

*Wilbur Smith Study*

In December of 1970, the consulting firm of Wilbur Smith and Associates submitted to the New Hampshire Department of Public Works and Highways a preliminary feasibility study for a proposed east-west toll road extending from Hampton, New Hampshire, to the Vermont border. (Defts.' Ex. 48–56) The Wilbur Smith Study concluded that an east-west toll road from Hampton to Ver-

---

4. The National Highway Functional Classification System Manual defines "principal arterial" as follows:

The rural principal arterial system consists of a connected rural network of continuous routes having the following characteristics:

1. Serve corridor movements having trip length and travel density characteristics indicative of substantial statewide or interstate travel.

2. Serve 1/ all, or virtually all urban areas of 50,000 and over population and a large majority of those with population of 25,000 and over.

3. Provide an integrated network without stub connections except where unusual geographic or traffic flow conditions dictate otherwise (e. g., internation boundary connections and connections to coastal cities). (Defts.' Ex. 27–50 at II–10)

mont was not financially feasible because "net revenues would just about equal the interest and capital costs." [5] *Id.* at 5. The Wilbur Smith Study was financed solely by State funds and was not submitted to the FHWA.

### Photogrammetric Maps

In late 1969 or early 1970, Hans Meissner, Advanced Planning Engineer for the New Hampshire Department of Public Works,[6] reviewed the FST Study to determine the viability of constructing a four-lane limited access highway from Peterborough to Wilton. As part of his review, photogrammetric maps were prepared on which Meissner sketched alternative four-lane right-of-way layouts. (Meissner Testimony, Tr. at 29 and Pl's. Ex. 9–9a–f) One of the routes studied and drawn by Meissner conforms substantially with the proposed FST route. (Meissner Testimony, Tr. at 149) Meissner concluded from his review that the FST route remained viable and feasible from an engineering point of view.

He testified further that he performed the FST review on his own and that it did not represent a plan or a proposal to relocate Route 101 or construct a new east-west highway. In addition, Mr. Keneval, Planning and Economics Engineer for the NHDPW&H, stated that the study lines on the photogrammetric maps do not represent the NHDPW&H's current highway plans. (Keneval Testimony, Tr. at 218) Finally, the photogrammetric maps were never submitted to the FHWA for their approval or comment, and the division engineer for the FHWA testified that, prior to the August 7 and 8 hearing, he never saw the maps. (Comstock Testimony, Tr. at 294)

## THE TWO AREAS OF KEY CONCERN

### Milford

Defendants are presently planning to construct, with federal funds, a bypass in Milford, as suggested in FST Priority No. 4. Defendants have prepared a draft EIS for the Milford area. (Pl's. Ex. 11–38). In constructing the Milford bypass, the Federal Government will provide 70% of the funds and the State will provide the remaining 30%. (Defts.' Admission No. 37)

The proposal to construct the Milford bypass has not yet reached the hearing stage and, depending on the comments received during the NEPA review process, defendants hope to begin construction in approximately one year. (Comstock Testimony, Tr. at 298)

The draft EIS limits its environmental analysis to the Milford area, and does not consider whether construction will cause a significant environmental impact along the entire Route Corridor. The draft EIS states that "[t]he project under consideration is the final section of this bypass, which is considered to be of independent utility. The benefits provided by the proposal are not linked to or depend upon the completion of other projects." (Pl's. Ex. 11–38 at 1)

While both parties agree that the planned Milford bypass could be an integral link in a four-lane east-west limited access highway, defendants contend that the bypass has an independent utility which is premised on local traffic needs and safety.[7] The Draft Environmental Impact Statement declares that "[t]he length of existing highway which

5. Mr. Keneval, Planning and Economics Engineer for the NHDPW&H, testified that, in order to be financially feasible, a toll road "must have sufficient traffic to pay tolls sufficient to pay off the bond issue and to cover the maintenance and operation of the facility." (Keneval Testimony, Tr. at 237)

6. Mr. Meissner retired from the New Hampshire Department of Public Works on June 5, 1975.

7. "From January 1, 1972 to January 1, 1975 there were 79 accidents from the intersection of N.H. Routes 101–A and 101 to Jones Crossing. Of this total 59 percent have been multiple vehicle accidents involving 124 vehicles. There were 43 persons injured in the vehicles, one pedestrian was struck and there was one fatal during this period. 70 percent of the multiple vehicle accidents (rear-end collisions) are generally related to traffic congestion conditions. With imple-

serves the majority of eastwest travel through Milford presently stands as one of the most deficient sections of N. H. Route 101." (Pl's. Ex. 11–38 at 7)

Plaintiff introduced evidence, through the expert testimony of Robert L. Morris, Traffic Engineer, that the Milford bypass is not based on independent traffic needs, "but is part of the total relocation of Route 101." (Morris Testimony, Tr. at 153) He testified further that the proposed bypass is unnecessarily expansive in scope, if its primary purpose is to alleviate local traffic congestion.

My conclusion is that the alignment that is recommended in here is a part of a larger plan and that it is intended to be a segment of the total relocation of Route 101, and the alleviation of congestion that has been described before is incidental to the purpose of this road. And if that were its primary purpose, it would not go in this location. (Morris Testimony, Tr. at 154)

It must be noted that Morris did not gather or review any Milford traffic data nor did he walk through or around the Milford area; instead, he viewed the proposed construction with an overall perspective, aided by traffic data attained from other areas. *Id.* Tr. at 196.

*Dublin*

Construction of a bypass in Dublin is FST's Priority No. 5. The parties stipulate that the State is presently conducting studies for the improvement of Route 101 in the Dublin area and that these studies "include a line substantially corresponding to one shown in the FST Report, several other lines not shown in the FST Report, and the possibility of no improvement at all." (Stipulation No. 15) [8]

Informational hearings on the Dublin bypass were held on July 26, 1972, and June 19, 1973. (Pl's. Ex. 1–27 and 2–28)

At one time, the State was proposing the Dublin project for construction, but, whether as a consequence of this suit or due to other circumstances, the State has dropped the Dublin project from its current construction program. (Keneval Testimony, Tr. at 252) The fluctuating status of the Dublin project can be evinced by examining the State's Five Year Construction Programs. (Defts.' Ex. 20–65a–d) In the latest five-year program, which covers the fiscal years 1976–1980, the Dublin project is not listed for proposed construction. It is, however, listed under the heading of "Federal Aid Rural Primary-Future Projects." (Defts.' Ex. 20–65d) Under an earlier five-year construction program, the Dublin project was listed as a construction priority. (Defts.' Ex. 20–65a)

The planning of a project for the five-year program does not represent a state commitment to construct. Many times a project will be forgotten or bypassed due to a change in financial or political conditions. The Dublin project's present status is stipulated to as follows:

Studies are currently underway for the improvement of Route 101 in the Dublin area. The studies are preliminary studies which have been undertaken by the State defendant for the purpose of considering at least four alternate locations, including the existing location and the possibility of no improvement at all to Route 101. If the State defendant determines that an improvement to Route 101 in the Dublin area is necessary after the studies have been completed and if funds are available for preliminary engineering, right-of-way acquisition, and construction, he may, in his discretion, propose the laying out of an improvement to the Governor and Council, who may, in their discretion, determine upon public hearing whether there is occasion for the laying out of a highway improvement in the Dublin area. It

mentation of the proposal the congestion problem creating the accident conditions will be reduced." (Pl's. Ex. 11–38 at 6–7)

8. The dark green line on Plaintiff's Exhibit 13–6 is the route line suggested in the FST Study. (Meissner Testimony, Tr. at 47; Morris Testimony, Tr. at 156)

is entirely possible that a bypass of Dublin may be required to provide a level of service compatible and reasonable for the traffic demands imposed upon Route 101, without regard to the size of Dublin. (Stipulation No. 14)·

In the area around Dublin, most of the traffic served by Route 101 (about 70%–80%) is through, not local traffic. (Stipulation No. 6)

In short, the Dublin project remains in the preliminary route location stage, with the State still evaluating and considering various route alternatives. No Draft EIS has been prepared for the Dublin project.

Morris testified that the alternatives being studied for the Dublin bypass are excessive from a financial and engineering point of view, and that they are "intended to accomplish something substantially greater than just alleviating a condition in Dublin." (Morris Testimony, Tr. at 171) Morris testified further that there was an alternative route available, which the State was not considering, that would satisfy the need for bypassing Dublin and, at the same time, greatly reduce the scope of construction. *Id.* at Tr. 155–156. Keneval testified that there was no limit on the alternative routes to be studied, and that the NHDPW&H would consider the Morris proposal. (Keneval Testimony, Tr. at 242–243, 267)

The one salient feature of the Dublin project is that, while the NHDPW&H is not presently planning to construct a bypass, it may in the immediate future reverse that decision and begin a plan for construction. The State has not given any iron-clad assurances that construction will not proceed in the Dublin area in conformity with the FST Priority No. 5.

Up to this point, the FHWA has not approved any State plan or proposal to construct a bypass in Dublin nor has any State plan or proposal been submitted to the FHWA.

## FEDERAL FUNDING OF HIGHWAY PROJECTS AND STUDIES LOCATED ON ROUTES 101 and 9

Federal funds have been extensively used for highway construction along Routes 101 and 9. (Pl's. Ex. 39–24; *see also,* Defts.' Admissions Nos. 34, 35, 76) Plaintiff's Exhibit 7–20 indicates that federal monies were spent on construction along Route 101 east of Keene, west of Peterborough, and in Amherst.[9] The planning of the Milford bypass was aided by federal highway planning, research and development funds (HPR funds) and 70% of the Milford construction will be paid with federal money. HPR funds were also used for the Dublin project. (Meissner Testimony, Tr. at 54). Finally, the NHDPW&H has used HPR funds for studying the possibility and feasibility of relocating Route 101 from Keene to Bedford. (*Id.* at Tr. 54–55; *see also,* Pl's. Ex. 17–7, 18–7a, and 19–8).

### FACTS

The basic facts are not in dispute; but it is the conclusions that are to be drawn from these facts which give rise to this action.

Plaintiff's claim that there is an undisclosed plan to relocate Route 101 and construct a new east-west highway is based on the following facts: (1) that the FST Study advised that there was a "definite need" for a four-lane divided highway from Keene to a point on the F. E. Everett Turnpike between Manchester and Nashua; (2) that the FST Study proposed a route location which would accommodate the new east-west highway; (3) that in order to achieve the construction of a new east-west highway, the study recommended a ten stage

---

9. "The map of [Pl's.Ex. 39–24] shows the Federal projects that have taken place on the Route 9–101 corridor. The projects marked in red . . . encompass a four-lane right-of-way in which two-lane construction has taken place. The dotted red [line] . . . is a project with Federal design approval but no construction as yet. Those projects whose numbers begin with 'F' or 'R' have been federally funded." (Stipulation No. 27)

construction program; (4) that 40% of the stage program has already been constructed or is being planned for. immediate construction; (5) the NHDPW&H still uses the FST Study as a source of information; (6) Hans Meissner, Advanced Planning Engineer of the NHDPW&H, testified that as of June, 1975, the recommended FST route was viable and feasible from an engineering point of view; (7) in early 1970, Meissner prepared photogrammetric maps which indicated that the proposed FST route was under active study; (8) that on July 26, 1972, Meissner publicly declared that the "total goal" of the NHDPW&H is "to get from Manchester to the Connecticut River"; (8) that the Dublin project, which is FST Priority No. 5, has been a NHDPW&H construction priority; and (9) that defendants may decide at any moment to construct the Dublin bypass in accord with the route line suggested in the FST Study.

Defendants argue that they have no present plan, intent, or commitment to relocate Route 101 and that the NHDPW&H has not submitted to the FHWA any surveys, plans, specifications, and estimates for a new east-west highway. In addition, defendants note that the Governor, either with the advice of the Council, or on his own motion, has not determined that there is a State need for a new east-west highway in southern New Hampshire. No such highway could be constructed without a determination of State need by the Governor and Council. (N.H. RSA 236:2)

Defendants argue further that the FST Study and the photogrammetric maps are no longer viable because of the energy crisis, triple-digit inflation,[10] and changing population trends and travel characteristics.

Regarding the effect that inflation has had on highway construction, Mr. Harris testified that "[t]he department's priorities have definitely changed. We, at this point, no longer feel that we are going to be in a position to build many more new highways on new location." (Harris Testimony, Tr. at 127)

Defendants contend further that changing conditions have invalidated FST's conclusion that there is a "definite need" for a four-lane highway from Keene to Merrimack. (Keneval Testimony, Tr. at 220) The State argues that in recent years the NHDPW&H's priorities have drastically changed and that the present priorities are limited to "upgrading the existing highway system on existing location." *Id.* at Tr. 229. Keneval testified that the NHDPW&H's primary consideration is the improvement of the deficient portions of Route 101 through "betterment" construction. He defined "betterments" as follows:

Improvement to the existing road. It may be the flattening of some curves, widening of the pavement or the improvement of the shoulder. *Id.* at Tr. 239.

It should be added that, in response to questions by the court, Keneval stated that betterments do not include route relocations or acquisitions of rights-of-way. Tr. at 240.

In its 1974 National Transportation Study, the New Hampshire Department of Public Works and Highways noted that:

Today the possible construction of 166 miles of highway on new location seems rather remote. The current energy shortage, with the prospect of future deficiencies, environmental concerns and subsequent litigation will increase the proportion of highway reconstruction and betterment improvement projects. (Defts.' Ex. 29–49 at II–68)

Comstock, on behalf of the FHWA, testified that, while it may be desirable to construct a four-lane east-west facility, present traffic demands do not necessitate its construction. (Comstock Testimony, Tr. at 299–300)

---

10. George Harris testified that a $500,000 highway project in 1969 would cost $1,250,000 today, a 250% inflationary increase. (Harris Testimony, Tr. at 125)

Defendants argue finally that the photogrammetric maps are not probative of the New Hampshire Department of Public Works and Highway's intent because they were prepared by Meissner on his own motion, and not at the Department's direction. In fact, Meissner testified that he did not think that he showed the maps "to anybody." (Meissner Testimony, Tr. at 85)

It is highly important to note that the plaintiffs do not frontally assault the legal sufficiency of the Milford Draft EIS, but, instead, they focus their attention on the Dublin project, and the incremental construction to date.[11] During direct examination, Morris was asked only seven questions concerning the Milford Draft Environmental Impact Statement. His chief concern was that the project was not designed to serve "purely local needs," but was part of a larger undisclosed plan. No evidence was introduced regarding logical route termini; nor did plaintiff establish that it was environmentally unreasonable for the defendants to limit the scope of the Milford Draft EIS to the Milford area. It is fair to conclude that it was not plaintiff's intent to challenge the legal sufficiency of the Milford Draft EIS. This turns the court's eyes to Dublin.

At this time, no construction is being planned for Dublin. The FST Study lists Dublin as the next priority. It would, however, be speculative for this court to conclude now that the defendants are going to follow the route line suggested in FST Priority No. 5.

One essential fact remains clear: while the NHDPW&H has not approbated the FST Study, it has paid great fidelity to its recommendations. I cannot ignore the possibility that the NHDPW&H may decide to construct the Dublin bypass, in accord with the FST route recommenda-

tion, and that 50% of the ten FST steps towards relocation of Route 101 will have been completed in the absence of an overall EIS. It is also highly probable that the construction of 50% of the FST priorities will have a coercive effect on further highway construction and will impair the effective study of other route alternatives. The State has not given any representation that it will not relocate or construct a new east-west highway. Keneval testified that, at this time, there has been no decision made on the relocation of Route 101. (Keneval Testimony, Tr. 264) Obviously, this failure to decide is pregnant with possibilities— one of which is the eventual construction of a new east-west highway.

## THE LAW

■ It would be repetitive for me to analyze, once again, the laudatory environmental purposes of NEPA. *Appalachian Mountain Club v. Brinegar,* 394 F.Supp. 105 (D.N.H.1975); *see also Calvert Cliffs' Coord. Com. v. Atomic Energy Com'n,* 146 U.S.App.D.C. 33, 449 F.2d 1109 (1971). Simply put, NEPA is designed to encourage prudence and wisdom in the management of our nation's environmental affairs.

In order to achieve this goal, Congress directed that the policies embodied in NEPA be interpreted and administered "to the fullest extent possible." 42 U.S. C. § 4332. The First Circuit has noted that they could not "think of any stronger language which could have been used to underscore the importance of protecting the environment." *Silva v. Romney,* 473 F.2d 287, 292 (1st Cir. 1973).

■ The initial responsibility for determining whether an EIS should be prepared resides in the responsible federal agency. This decision cannot, however, evade judicial review for "[a]gency de-

---

11. The questioning of Mr. Morris on the adequacy of the Milford Draft EIS consisted of only three pages in the Transcript. (Tr. at 152–154) He testified, however, that the Dublin area was the one with which he was most familiar and that he both walked and drove through the area so that he could acquire firsthand knowledge of the location and its probable traffic needs. He also testified that he made a traffic data analysis of the Dublin area.

cisions in the environmental area touch on fundamental personal interests in life and health, and these interests have always had a special claim to judicial protection." *Scientists' Inst. For Pub. Info., Inc. v. Atomic Energy Com'n*, 156 U.S. App.D.C. 395, 481 F.2d 1079, 1094 (1973); *Save Our Ten Acres v. Kreger*, 472 F.2d 463 (5th Cir. 1973). It is the court's statutory responsibility to demand that NEPA's purposes do not become lost or obscured in the bureaucratic shuffle.

## WHEN DOES A STUDY TO CONSTRUCT BECOME A PLAN TO CONSTRUCT?

Defendants argue that there is no overall State or Federal plan to relocate Route 101 or construct a new east-west highway. They give ten reasons: (1) that Congress has not authorized federal funds to be appropriated for a "new east-west highway"; (2) that the Secretary of Transportation has not entered into a project agreement with the NHDPW&H regarding the construction and maintenance of a "new east-west highway"; (3) that the NHDPW&H has not been given Federal approval for constructing a "new east-west highway"; (4) that the NHDPW&H has not submitted any plan to the Secretary of Transportation regarding the eventual construction of a "new east-west highway"; (5) that the NHDPW&H has not requested the Secretary of Transportation to make funds available for right-of-way acquisition for a "new east-west highway"; (6) that the NHDPW&H has not sought PS&E approval from the Secretary of Transportation for a "new east-west highway"; (7) that the responsible New Hampshire State officials have not determined that there is a need for laying out a "new east-west highway"; (8) that the NHDPW&H has not submitted to the FHWA any plans for a "new east-west highway"; (9) that the NHDPW&H has not selected or proposed to the FHWA a location route for a "new east-west highway"; and (10) that the New Hampshire Legislature has not enacted any law which evinces an intent or a need to construct a "new east-west highway."

Defendants' argument is two-pronged: first, that no plan or recommendation to construct a new east-west highway has been proposed and this action is, therefore, premature; and second, if such a plan does exist, then it is not sufficiently "federalized" and does not constitute a "major Federal action."

The first argument has little merit. The fact that the State has denied the existence of a plan to construct a new east-west highway "does not end the controversy, but rather points to why the controversy exists." *Sierra Club v. Morton*, 514 F.2d 856, 873 (D.C.Cir. 1975). The defendants argue that this court should find that there is no intent, plan or commitment to construct a new east-west highway solely because they have publicly refused to put their imprimatur on the proposal. In essence, defendants argue that no plan exists because they claim no plan exists. "Such a *reductio ad absurdum* would make a mockery of" NEPA. *Id.* 514 F.2d at 875.

Courts have begun to recognize that state highway departments are "established to pursue defined state goals" and that "[i]n attempting to secure federal approval of a project, 'self-serving assumptions' may ineluctably color [their] presentation of the environmental data . . . ." *Conservation Soc. of S. Ver., Inc. v. Secretary of Tran.*, 508 F.2d 927, 931 (2d Cir. 1974), *aff'g* 362 F.Supp. 627 (D.Vt.1973); *Swain v. Brinegar*, 517 F.2d 766, 778–779 (7th Cir. 1975).

■ I must recognize that state highway departments, when pursuing their own interests, may have a certain difficulty in "seeing the forest for the trees." To rule that the NHDPW&H has the power or the ability to definitively determine when a plan exists for NEPA purposes, would be to allow the State, by its own decision, to defeat a Congressionally declared national policy. In resolving whether a plan exists, courts

should not look to public declarations or semantics; instead, they should inquire into the underlying facts and circumstances. *Sierra Club v. Morton, supra,* 514 F.2d at 873.

■ An examination of the facts surrounding the construction along Route 101 provides clear and supportive evidence from which it can be reasonably inferred that a plan to construct a new east-west highway exists, at least in the dormant stage.

In 1962, the FST Study concluded that there was a "definite need" to construct a new four-lane facility in southern New Hampshire. In order to achieve this end, it recommended a ten stage construction program which, when completed, would "provide a complete workable facility from Keene to Merrimack." (Pl's. Ex. 4–3 at App. p. 5) The State, while specifically denying the existence of a plan and arguing that construction priorities have changed, has followed the first four FST priorities, and is presently studying the possibility of constructing the fifth priority in Dublin. (Stipulation No. 18) While the FST recommendations may not be "inflexible covenants," *Citizens Against Destruction of NAPA v. Lynn,* 391 F.Supp. 1188, 1193 (N.D.Calif. 1975), the State appears to be following them with consistent regularity.

Courts should also inquire not only as to what has been constructed, but also as to what may be constructed. All the pieces need not be fitted precisely into the puzzle before a picture takes shape.

■ The piecemeal construction of various highway projects which are admittedly capable of becoming integral links in a new east-west highway, along with the concomitant coercive pressure for further highway construction, involves an "irreversible and irretrievable" commitment of resources which deserves close judicial scrutiny. *Cf. Sierra Club v. Morton, supra,* 514 F.2d at 873; *SIPI, supra,* 481 F.2d at 1086–1087 n. 29; *Greene County Planning Board v. Federal Power Com'n,* 455 F.2d 412, 424 (2nd Cir. 1972).

In *Conservation Society, supra,* 362 F.Supp. at 636, the Federal and State defendants argued that there was "no overall federal plan for improvement of the Route 7 corridor . . . into a divided limited access superhighway," and that each construction segment had its own independent utility and was not part of an overall highway plan.

Judge Oakes found that, although there was "no overall federal plan"

the three states' highway departments are looking toward this end as possible of accomplishment with legislative and federal approval over a long-range period of time, with federal approval taking place on an ad hoc basis at the division engineer level. The court finds, moreover, on the basis of the testimony of Mr. Morris that the construction of isolated sections along the corridor will induce traffic, tending further to require additional construction beyond presently planned termini. The court further finds that federal highway officials have knowledge of the overall planning process by state officials and to a considerable extent work in "partnership" with state officials in connection therewith, and that each of the three states has from time to time taken advantage of federal highway planning money specifically in connection with Route 7 improvement. *Id.* at 636.

Defendants claim that *Conservation Society* is inapposite for four reasons: (1) that "the overall route, line, or general location" for the construction of a superhighway across Vermont was submitted by the Vermont State Highway Department "to the federal agency and received substantial acceptance therefrom. . . ." *Conservation Society of Southern Vermont, Inc. v. Volpe,* 343 F. Supp. 761, 764 (D.Vt.1972); (2) the court found that substantial construction had already taken place, *Conservation Society, supra,* 362 F.Supp. at 636; (3) the Vermont Legislature had issued a "legislative mandate" for the construction of Route 7, *Conservation Society,*

*supra,* 343 F.Supp. at 763; and (4) the Connecticut Legislature had "authorized bonding" to pay for the construction of Route 7 in Connecticut. *Citizens for Balanced Environ. and Transp., Inc. v. Volpe,* 376 F.Supp. 806, 813 (D.Conn.), *aff'd* 503 F.2d 601 (2d Cir. 1974).

While there has been no pronouncement from the New Hampshire Legislature that there is a need for a new east-west highway, this factor is not dispositive and does not negate the thrust of plaintiff's argument. The essential determination to be made is whether, under all the facts and circumstances, it is reasonable to conclude that defendants are contemplating construction which could inevitably be part of a new east-west highway. One immutable fact remains clear: that the State with the assistance and approval of the FHWA has constructed the first four FST priorities. It is this essential fact which brings this case within the purview of *Conservation Society.*

The federal goal in constructing a new east-west highway remains amorphous. Comstock testified that, while it may be desirable to construct a four-lane highway facility, present traffic needs do not demand it.

I must recognize that the fecund highway construction which has permeated our society, and which, indeed, was a primary consideration in NEPA's enactment, has been based on desires as well as demands. Courts are beginning to recognize that "highways often create demands for travel and expansion by their very existence." *Swain, supra,* 517 F.2d at 777; *Society for Pro. of New Hampshire Forests v. Brinegar,* 381 F.Supp. 282, 285 (D.N.H.1974).

It is from this perspective that the FST Study must be viewed and analyzed. With 40% of the steps necessary to construct a new east-west highway near completion, it is unrealistic to contend that the project has not reached a "coherent stage of development." *Citizens for Clean Air, Inc. v. Corps of Eng., U. S. Army,* 349 F.Supp. 696, 708 (S.D.N.Y.1972). The lesson of *Conservation Society* is that it is not necessary for the court to find an overall federal plan before NEPA becomes applicable and an EIS required.

I, therefore, find that while there is presently no overall federal plan to construct a new east-west highway, such a project is "possible of accomplishment with legislative and federal approval over a long-range period of time . .." , *Conservation Society, supra,* 362 F.Supp. at 636; *Sierra Club v. Morton, supra,* 514 F.2d at 873, and that NEPA is, therefore, applicable.

The next question is whether the "plan" has become sufficiently federalized so that it constitutes a "major Federal action."

### WHEN DOES A HIGHWAY PROJECT BECOME FEDERALIZED?

In order to understand how and when a highway project becomes "federalized", it is essential to have an understanding of the Federal-aid highway program's administrative procedure.[12]

The FHWA is the Federal agency which is responsible for the administration of the Federal-aid highway program. The FHWA's chief function is to ascertain "that the state highway departments have adhered to federal law

---

12. "Under 23 U.S.C. § 103, the Federal-Aid Highway Program consists of three systems: (1) the Interstate System (§ 103(d)), which is to 'connect . . . the principal metropolitan areas' and 'serve the national defense. . . . .'; (2) the Federal-aid primary system (§ 103(b)), which 'shall consist of an adequate system of connected main highways'; and (3) the Federal-aid secondary system (§ 103(c)), which may include 'farm-to-market roads, rural mail routes, public school bus routes, local rural roads, county roads, township roads, and roads of the county road class . . . .'" *Lathan v. Brinegar,* 506 F.2d 677, 682 n. 4 (9th Cir. 1974). Route 101 is part of the Federal-aid primary system.

and regulations before authorizing reimbursement to the states for a portion of the federal-aid highways' cost." *Lathan v. Brinegar, supra,* 506 F.2d at 682. The FHWA does not plan, design or locate highways; pursuant to the twin principles of federalism and state sovereignty, these functions are reserved to the individual states. 23 U.S.C. § 145 declares:

> The authorization of the appropriation of Federal funds or their availability for expenditure under this chapter shall in no way infringe on the sovereign rights of the States to determine which projects shall be federally financed. The provisions of this chapter provide for a federally assisted State program.

New Hampshire law states that the Commissioner of the Department of Public Works and Highways is responsible for

> all matters pertaining to the location, route, alteration, construction, reconstruction, maintenance and discontinuance of highways constructed or maintained wholly or in part by money appropriated from the state treasury, . . . .. N.H. RSA 229:6.

In addition, New Hampshire law dictates that the layout, location, and nature of a proposed limited access highway lies solely within the discretion of the Commissioner of the NHDPW&H. N.H. RSA 236:3-5; *Kostrelos v. Merrill,* 101 N.H. 317, 319, 143 A.2d 400 (1958).

In order to avail itself of federal aid, the NHDPW&H must "obtain federal approval at various stages during the conception and building of a highway project." *Lathan v. Brinegar, supra,* 506 F. 2d at 682.

The first stage in the pursuit of Federal highway aid is "Federal program approval." 23 U.S.C. § 105(a) requires every state highway department

> of any State desiring to avail itself of the benefits of this chapter shall submit to the Secretary for his approval a program or programs of proposed

projects for the utilization of the funds apportioned.

The next stages arise from the public hearings provision of the Federal Highway Act of 1958, as amended, 23 U.S.C. § 128(a), which requires state highway departments to hold two public hearings in order to be eligible for federal aid.

The first public hearing is entitled a "corridor public hearing." The purpose of this hearing is to provide

> a public forum that affords a full opportunity for presenting views on each of the proposed alternative highway locations and the social, economic, and environmental effects of those alternate locations. 23 C.F.R. § 790.3(a) (3) (1975).

The " 'corridor public hearing' is . . . held before the route location is approved and before the state highway department is committed to a specific proposal." 23 C.F.R. § 790.3(a)(1) (1975). After holding a "corridor public hearing," the State can seek "route location approval" from the FHWA.

After "route location approval" has been given, the State must then hold a "highway design public hearing." The design public hearing

> Is held to ensure that an opportunity is afforded for effective participation by interested persons in the process of determining the specific location and major design features of a Federal-aid highway; and

> Provides a public forum that affords a full opportunity for presenting views on major highway design features, including the social, economic, environmental, and other effects of alternate designs. 23 C.F.R. § 790.3(b)(2)–(3) (1975).

The design selected is then submitted to the FHWA for plans, specifications, and estimates approval. (PS&E) It is only after PS&E approval is given that the FHWA becomes contractually obligated to reimburse the state for the costs incurred during the construction proj-

ect. *Lathan v. Brinegar, supra,* 506 F. 2d at 686.

■ I start my analysis with the observation that the determination whether the FHWA's actions constitute a "major Federal action" is a "mixed question of fact and law." *Sierra Club v. Stamm,* 507 F.2d 788, 791 (10th Cir. 1974).

The underlying question is whether Route 101 has taken on a "federal character" as the result of a federal-state partnership in the planning and the construction of certain highway projects.

At one time, courts looked for a triggering event before applying NEPA. In *La Raza Unida v. Volpe,* 337 F.Supp. 221, 227 (N.D.Calif.1971), *aff'd* 488 F.2d 559 (9th Cir. 1973), the court held

> that for the purpose of applying the various federal statutes and regulations a federal-aid highway is any project for which the state has obtained location approval.

In *Sierra Club v. Volpe,* 351 F.Supp. 1002, 1007 (N.D.Calif.1972), the court noted, in applying the *La Raza* rationale,

> that common sense suggests that all the protections which the Congress has sought to provide would be futile gestures were the states and federal agencies allowed to ignore federal statutes and regulations until deleterious effects upon the environment have actually occurred while the option for receiving federal funds still remains open.

In *SIPI, supra,* 481 F.2d at 1089, the court found that any federal agency action "which permitted some other party—private or governmental—to take action affecting the environment" constituted "Federal action." Towards this

flexible and expansive view of "Federal action" is *Conservation Society* where the court found that, while there was no federal plan to construct a superhighway, the federal and state highway officials had formed a "partnership" and that this was sufficient to establish the requisite degree of federal action. *Id.* 362 F. Supp. at 636. *Cf. Jones v. Lynn,* 477 F. 2d 885, 893–895 (1st Cir. 1973) (Coffin, J. concurring).

In *Boston v. Volpe,* 464 F.2d 254, 256 (1st Cir. 1973), involving the "construction of the Outer Taxiway at Logan Airport," the court, by way of dicta, noted that "[i]n all of the cases in which a court found a highway to be federal, the federal government had at least granted location approval." [13] *Id.* at 259. The court recognized, however, that, in order for NEPA to be viable and its Congressional purposes fulfilled, it was necessary "that what would be assessed was a *proposed* action, not a fait accompli." *Id.* at 257. (Emphasis in original.)

In a later opinion, *Silva v. Romney,* 473 F.2d 287 (1st Cir. 1973), the court, having distinguished the superficially controlling *City of Boston v. Volpe,* felt the need to confess

> to a sense of growing uneasiness in seeing decisions determining the obligations of federal and non-federal parties under NEPA turn on any one interim step in the development of the partnership between the parties. Such an approach unrealistically stresses adventitious factors which bear little relationship to either the broad concerns of NEPA or the interests of the potential grantee, private or public. *Id.* at 290.

---

13. *City of Boston v. Volpe,* 464 F.2d 254 (1st Cir. 1972), held that a "tentative allocation" of federal funds for an airport project did not amount to "Federal action." That holding has insignificant bearing upon the law of this case. First, *Boston* distinguished itself from highway allocations, reasoning that highways involved federal government commitments by degrees; whereas airports involve a yes-or-no decision. *Id.* at 258–259.

The obvious implication is that in highway cases, a partnership might exist prior to the actual commitment of funds. Second, in *Silva v. Romney,* 473 F.2d 287 (1st Cir. 1973), the First Circuit reaffirmed the distinction between highway and airport projects. Third, in *Silva v. Romney,* the court noted an intent to move away from rendering a decision in this area upon "any one interim step." *Id.* at 290.

The essence of these cases indicates the trend away from any "Federal action" litmus test. They recognize that federal participation may be in incremental steps, each one environmentally innocuous, but whose cumulative effect is the "irreversible and irretrievable" commitment of resources way beyond that expended in the initial project. *City of Boston v. Volpe, supra*, 464 F.2d at 258 n. 5. This factor is recognized in the Council for Environmental Quality's guidelines [14] which provide that the term "Federal action" must be construed

with a view to the overall, cumulative impact of the action proposed, related Federal actions and projects in the area, and further actions contemplated. Such actions may be localized in their impact, but if there is potential that the environment may be significantly affected, the statement is to be prepared. Proposed major actions, the environmental impact of which is likely to be highly controversial, should be covered in all cases. In considering what constitutes major action significantly affecting the environment, agencies should bear in mind that the effect of many Federal decisions about a project or complex of projects can be individually limited but cumulatively considerable. This can occur when one or more agencies over a period of years puts into a project individually minor but collectively major resources, when one decision involving a limited amount of money is a precedent for action in much larger cases or represents a decision in principle about a future major course of action, or when several Government agencies individually make decisions about partial aspects of a major action. In all such cases, an environmental statement should be

prepared if it is reasonable to anticipate a cumulatively significant impact on the environment from Federal action. 40 C.F.R. § 1500.6(a) (1974).

■ This is especially relevant in highway cases, for the construction of a highway necessarily limits the viability of alternate route studies, due to the "money in the ground effect" of pavement construction. Accordingly, the

[d]etermination of whether federal and state projects are sufficiently interrelated to constitute a single "federal action" for NEPA purposes will generally require a careful analysis of all facts and circumstances surrounding the relationship. At some point, the nexus will become so close, and the projects so intertwined, that they will require joint NEPA evaluation. *Friends of Earth, Inc. v. Coleman*, 518 F.2d 323, 329 (9th Cir. 1975).

In assessing the federal-state relationship, the court must look to all "the facts and the reasonable inferences to be drawn therefrom." *Thompson v. Fugate*, 347 F.Supp. 120, 124 (E.D.Va.1972); *see also, River v. Richmond Metropolitan Authority*, 359 F.Supp. 611, 635 (E.D.Va. 1973).

The facts disclose that federal funds have been used in the planning and construction of the first four FST priorities. In addition, the NHDPW&H has used federal highway planning, research, and development funds to finance their study concerning the possibility and feasibility of relocating Route 101 from Keene to Bedford. Finally, the NHDPW&H has been diligent in preserving its eligibility for federal funds and there is every indication that the NHDPW&H will continue to seek federal financing for construction projects along Route 101.

14. The CEQ is comprised of three persons, selected by the President, with whom all impact statements are filed. Their functions are:

. . . to analyze and interpret environmental trends and information of all kinds; to appraise programs and activities of the Federal Government in the light of the policy set forth in subchapter I of this chapter; to be conscious of and responsive to the scientific, economic, social, esthetic, and cultural needs and interests of the Nation; and to formulate and recommend national policies to promote the improvement of the quality of the environment. 42 U.S.C. § 4344.

But the factors of overriding significance are that Route 101 construction has followed the FST Study and the FHWA has made numerous decisions which have allowed the NHDPW&H to construct the skeletal background for a new east-west highway. To argue that these facts do not sufficiently federalize Route 101 "as a major Federal action" is to misunderstand the role that the FHWA is designed to play under NEPA.

The FHWA's responsibility "is not simply to sit back, like an umpire," *Calvert Cliffs, supra,* 449 F.2d at 1119, relying solely on the state highway department to provide it with information and plans. It is the FHWA's responsibility and mandate to actively protect the public from wasteful environmental action and to actively determine that the state has fulfilled all of its responsibilities.

Defendants argue that the unique nature of the Federal-aid Highway Act allows the state to plan, design, and locate highways; I agree with this statement. But it cannot be concluded from this, as defendants would like, that the FHWA is a paper tiger whose sole function is to myopically approve state construction projects without looking to and keeping an eye on the "big picture."

> Thus NEPA is clearly intended to focus concern on the "big picture" relative to environmental problems. It recognizes that each "limited" federal project is part of a large mosaic of thousands of similar projects and that cumulative effects can and must be considered on an ongoing basis. *Swain v. Brinegar, supra,* 517 F.2d at 775.

If the FHWA is unwilling to look for an overall plan, then courts must exhibit "a sensitive eye to the options often imperceptibly foreclosed by fragmented growth." *Conservation Society, supra,* 508 F.2d at 936.

The true danger in this type of incremental construction is that by the time the NEPA review process begins, the project would be essentially completed and any assessment of the inherent dangers would prove to be a "hollow exercise." *Calvert Cliffs, supra,* 449 F.2d at 1128.

While this factor is one that is traditionally considered in determining whether the time is "ripe" for an EIS to be prepared, it is also highly relevant in determining whether a partnership exists between the state and the FHWA. When the FHWA has allowed the State to construct a skeleton that can be fleshed out for a new east-west highway, it would indeed be egregious if they could contend that they knew of no such plan. NEPA cannot be evaded by negligence. Any further construction in conformity with the FST priorities will gravely diminish the viability of other alternative route studies.

The defendants contend that their priorities have changed. But in today's fast-moving society, it is difficult to predict the future with any clarity, and it is quite possible that within a short span of time, the State may recognize that there is a "definite need" for a new east-west highway. While the NHDPW&H appears to be operating in good faith, they have given no assurances that construction will *never* take place; their "escape hatch" is large and accessible. *Sierra Club v. Morton, supra,* 514 F.2d at 883.

Defendants rely on four cases in support of their theory that no "major Federal action" has taken place. *Movement Against Destruction v. Volpe,* 361 F. Supp. 1360 (D.Md.1973), *aff'd* 500 F.2d 29 (4th Cir. 1974); *Citizens for Balanced Environ. and Transp., Inc. v. Volpe,* 376 F.Supp. 806 (D.Conn.), *aff'd* 503 F.2d 601 (2d Cir. 1974); *River, supra*; and *Atlanta Coalition on Transportation Crisis, Inc. v. Atlanta Regional Commission,* Civil No. 74–514A (N.D.Ga., June 9, 1975).

While *MAD, supra,* 361 F.Supp. at 1382, stated that the administrative policies adopted under the Federal Highway Act "contemplate each individual Federal-aid highway as the unit of federal consideration and action and not the network of highways which ultimately will

result from the approval and construction of the respective units," the court went on to recognize that there are situations where "the relationship of several roads or parts of road may be so interrelated that no one road or part of a road can function as an efficient carrier of motor vehicles except in conjunction with the others." *Id.* at 1384.

This statement underscores the distinguishable factor of *MAD.* In *MAD,* the plaintiff sought to enjoin a comprehensive interstate highway system which was designed to help alleviate urban congestion and, at the same time, facilitate interstate traffic. When a multifaceted highway is being planned for a large metropolitan area, it is reasonable to contend that various segments have their own independent justification, and that one segment should not be held hostage for another. *See Indian Lookout Alliance v. Volpe,* 484 F.2d 11, 19 (8th Cir. 1973); *Citizens for Mass Transit Against Freeways v. Brinegar,* 357 F. Supp. 1269, 1284 (D.Ariz.1973). In the instant case, I am dealing with a single highway; the only principal east-west highway in southern New Hampshire. Any improvement along Route 101 will cause an increase in traffic along that route and, in turn, will create a greater demand for further highway construction. When dealing with a single highway, rather than an intricate highway system, the dangers of self-fulfilling highway prophecies are imminent. I also believe that the impact of *MAD* was substantially undercut by *Conservation Society.*

In *River,* the significant factor relied on by the court in finding that there was no federal action was the overwhelming record to the effect "that the Downtown Expressway and the McLoy to Meadow Connector were never considered to be federal." *Id.* 359 F.Supp. at 634. This is not the situation here. Federal funds have permeated the construction along Route 101, and the defendants admit readily that there is the high probability that federal funds will be sought in the future for Route 101 construction. There is no doubt that the federal imprimatur is upon Route 101. Indeed, Judge Merhige, who also wrote *Thompson v. Fugate,* recognized

that state and federal highway authorities may not avoid the requirements of federal law by splitting what is in essence a single, federal project into several segments and funding certain of those segments with state funds only. . . .

In order to determine, therefore, when a group of segments should be classified as a single project for purposes of federal law, a court must look to a multitude of factors, including the manner in which the roads were planned, their geographic locations, and the utility of each in the absence of the other. *Id.* 359 F.Supp. at 634–635.

Once again, when dealing with a single highway where there has been testimony that the proposed construction is "part of a larger plan" the court should not accept the independent justification as a talisman. Almost every highway construction project has some independent justification. But it is when the proposed construction is more expansive than is necessary, that the "project-splitting" theory begins to take hold. Such is the situation here.

Defendants also rely on *Atlanta Coalition.* Unlike the instant case, the "system plan" in *Atlanta* is still being re-examined by the responsible state agency and no construction has taken place in conformity with the plan. Indeed, the plaintiff did not introduce any evidence to establish that any construction was even being planned in accordance with the "system plan." *Id.* at 3.

The fourth case which defendants rely on is *Citizens for Balanced Environment,* and is their strongest authority.

When faced with conflicting authority, which has not emanated from a court of higher authority, a judge can do one of three things: (1) ignore it; (2) distinguish it; or (3) disagree with it. I can only do the latter. *See also, Citizens,*

*supra*, 503 F.2d at 602–607 (Winter, J., dissenting).

In his opinion, Judge Newman recognized that the question whether the cumulative effect of federal assistance was sufficient to constitute a "major Federal action" was a "close" one. Nevertheless, he refused to find the requisite degree of federal action. In determining whether the federal-state nexus has become "close enough", courts should view the activity with a "sensitive eye" if they are to fulfill Congress' direction that NEPA be interpreted to "the fullest extent possible." While "Solicitude for the environment cannot substitute for legislation," *Citizens, supra*, 376 F.Supp. at 812, Congress has empowered the Judiciary to liberally interpret NEPA's requirements.

■ ■ Almost every decision that has considered the "federalization" problem has recognized that highway construction is *sui generis*. *Friends of Earth, supra*, 518 F.2d at 329; *Ely v. Velde*, 497 F.2d 252, 256 (4th Cir. 1974). Highways have a tendency to grow "like Topsy." I believe that if it is found that the federal agency has taken action which has allowed the state to construct a skeletal outline for a new highway, which will have a significant impact on the surrounding environment and that federal funds have been used in such construction, then this level of participation constitutes a "major Federal action." A failure to so apply NEPA would create a situation where our nation's highways would be built on a "patchwork basis" with the states constructing those highway portions which are the most environmentally controversial with their own funds, and using federal funds to construct those portions which pose no environmental threat.

To fail to view the construction along Route 101 as a "major Federal action" would be to take an "unnecessarily crabbed" view of NEPA, *SIPI, supra*, 481 F.2d at 1086, and to thwart its major purpose as a national environmental policy. 42 U.S.C. § 4331.

This is not a situation where the plaintiff is attempting to federalize a highway project solely because: (1) the state is using HPR funds during the study stage, (2) the state may apply for federal funds in the future, or (3) the state has endeavored to remain eligible for future federal funding. Federal participation has gone far beyond the "exploratory stage." *Cf. Boston v. Volpe, supra*, 464 F.2d at 258.

Whether a new east-west highway is to be built is for the responsible State officials to decide. But I find that all construction along Route 101 which conforms substantially with any of the FST priorities must be deemed a "major Federal action" requiring the preparation of a comprehensive EIS.

### IS THE TIME RIPE FOR AN EIS TO BE PREPARED?

■ A finding that the construction along Route 101 is a "major Federal action" "does not mean, *ipso facto*, that a comprehensive regional impact statement is required" now. *Sierra Club v. Morton, supra*, 514 F.2d at 879.

■ Although I have found that the Milford EIS is not legally deficient, I rule that plaintiff may challenge defendants' failure to prepare a regional EIS without seeking a judicial determination that a particular project's EIS is defective. *Sierra Club v. Morton, supra*, 514 F.2d at 868–870 n.20; *Conservation Society, supra*, 508 F.2d at 936.[15] The Sen-

---

15. Although cited to by defendants, I find that the recently decided case of *Aberdeen & Rockfish R.R. Co. v. SCRAP*, 422 U.S. 289, 95 S.Ct. 2336, 45 L.Ed.2d 191 (1975), is of no decisional significance. *SCRAP* concerned the legality of the ICC's refusal to suspend a 2.5% increase in their freight rates, without preparing a detailed environmental statement.

"The complaint sought to compel the ICC to suspend the rate surcharge and to enjoin the railroads from collecting it." *Id.* 95 S.Ct. at 2345. In addition, plaintiff alleged that "the failure of the ICC to hold hearings after preparing a draft of the statement violated the command of the statute that the statement 'accompany the proposal through the ex-

ate Report accompanying NEPA states expressly that one function of the Act is to provide the public and the responsible decision makers with the opportunity to analyze the cumulative environmental impact of small and seemingly unrelated construction projects.

"Important decisions concerning the use and the shape of man's future environment continue to be made in small but steady increments which perpetuate rather than avoid the recognized mistakes of previous decades." S.Rep.No. 91–296, 91st Cong. 1st Sess. 5 (1969) cited in *Greene County Planning Board, supra,* 455 F.2d at 424.

In order to prevent these "recognized mistakes," Congress directed that a detailed environmental statement must accompany all "major Federal actions" significantly affecting the environment.

> The "detailed statement" required by § 4332(2)(C) serves at least three purposes. First, it permits the court to ascertain whether the agency has made a good faith effort to take into account the values NEPA seeks to safeguard. To that end it must "explicate fully its course of inquiry, its analysis and its reasoning." \* \* \* Second, it serves as an environmental full disclosure law, providing information which Congress thought the public should have concerning the particular environmental costs involved in a project. To that end, it "must be written in language that is understandable to nontechnical minds and yet contain enough scientific reasoning to alert specialists to particular problems within the field of their expertise." \* \* \* Finally, and perhaps most substantively, the requirement of a detailed statement helps insure the integrity of the process of decision by precluding stubborn prob-

lems or serious criticism from being swept under the rug. *Silva v. Lynn,* 482 F.2d 1282, 1284–1285 (1st Cir. 1973).

A failure to timely prepare an EIS renders these goals nugatory. *See also, Chelsea Neighbor. Ass'n v. United States Postal Serv.,* 389 F.Supp. 1171, 1181 (S. D.N.Y.1975).

■ Defendants claim that, because there is no plan, intent or commitment to construct a new east-west highway, any judicially required EIS would be based on mere speculation and prophecy, and that any environmental conclusions would be "arrived at by guesswork rather than analysis." *SIPI, supra,* 481 F. 2d at 1093. The conflict between a premature EIS and a tardy EIS was cogently stated by the *SIPI* court:

> Thus we are pulled in two directions. Statements must be written late enough in the development process to contain meaningful information, but they must be written early enough so that whatever information is contained can practically serve as an input into the decision making process. *Id.* at 1094.

In order to resolve this tension, the *SIPI* court, in *Sierra Club v. Morton,* evolved a balancing test which would enable the court to weigh and assay the conflicting values and interests:

> How likely is the program to come to fruition, and how soon will that occur? To what extent is meaningful information presently available on the effects of implementation of the program, and of alternatives and their effects? To what extent are irretrievable commitments being made and options precluded as refinement of the proposal progresses? How severe will be the environmental effects if the

---

isting agency review processes.' " *Id.* at 2344. *SCRAP* is easily distinguishable on the following grounds: (1) it involved the ICC's "wide discretion to decide what issues to address in a general revenue proceeding . . . ." *Id.* at 2343; (2) the action contemplated by the ICC was environmentally neutral on its face;

(3) the environmental impact of the railroad's proposal was being considered "in a more appropriate proceeding." *Id.* at 2359; and (4) the ICC gave an adequately "hard look" at environmental matters. *Id.* at 2359. All these factors, plus many more, are not present in the instant case.

program is implemented? *Id.* 514 F. 2d at 880.

Because of the State's repeated assertion that it has no intent to construct a new east-west highway, it is unclear when and if such construction will take place. The question of fruition is one which cannot be adequately determined at this time. If the NHDPW&H's priorities remain the same, then only "betterment" construction will take place along Route 101. In order to protect the safety of the traveling public, the NHDPW&H should be free to engage in "betterment construction" without preparing a detailed impact statement, provided that they use only State funds.

Plaintiff brought this suit because it believed the defendants were covertly planning the construction of a new east-west highway. Whether plaintiffs are prescient or the defendants myopic, need not now be decided. I find that the construction along Route 101 "lacks in definition" and that it is too early to require the defendants to prepare a detailed EIS. *See Sierra Club v. Morton, supra,* 514 F.2d at 881 n.34. In addition, the other three balancing factors cannot adequately be determined at this time. If, at a later date, defendants propose to construct highway projects along Route 101, then these balancing factors would become sufficiently crystalized and an EIS would be both appropriate and meaningful. But in view of the fact that priorities may change, I am "convinced that the most appropriate way to proceed in this action is to issue no injunction but to retain jurisdiction and require defendants to keep plaintiffs informed of any impending federal action." *Citizens for Mass Transit Against Freeways, supra,* 357 F.Supp. at 1282–1283. A watchful judicial eye is, at times, more appropriate than an interfering judicial hand.

It is hereby ordered that defendants keep plaintiff and the court informed of any plans for construction which conform to any of the FST priorities and any other highway construction along Route 101 which could serve as a link in the construction of a new east-west highway. Plaintiff shall be allowed to renew its complaint should there be any further construction along Route 101 which could serve as part of a new east-west highway. In arriving at this decision, I am counseled by Thomas Jefferson's wise words:

> It is better to keep the wolf out of the fold than to trust to drawing his teeth and talons after he shall have entered. T. Jefferson, Notes on the State of Virginia, "Query XIII" (1787).

*The Intergovernmental Cooperation Act of 1968, 42 U.S.C.A. § 4231 (ICA)*

ICA establishes a Congressional priority in the "sound and orderly" economic and social development of our nation and its natural resources. 42 U.S.C. § 4231(a).

It dictates that the President "shall" establish "rules and regulations governing the formulation, evaluation, and review of Federal programs and projects having a significant impact on area and community development . . . ." Such rules should fully consider certain specified objectives and permit "reasoned choices" to be made when needed "between such objectives when they conflict." 42 U.S.C. § 4231(a). The objectives specified are:

(1) Appropriate land uses for housing, commercial, industrial, governmental, institutional, and other purposes;

(2) Wise development and conservation of natural resources, including land, water, minerals, wildlife, and others;

(3) Balanced transportation systems, including highway, air, water, pedestrian, mass transit, and other modes for the movement of people and goods;

(4) Adequate outdoor recreation and open space;

(5) Protection of areas of unique natural beauty, historical and scientific interest;

(6) Properly planned community facilities, including utilities for the supply of power, water, and communications, for the safe disposal of wastes, and for other purposes; and

(7) Concern for high standards of design.

Subsection (b) states that:

[a]ll viewpoints—national, regional, State, and local—shall, to the extent possible, be fully considered and taken into account in planning Federal . . . programs and projects. *Id.*

▆▆ The purpose of the Act is "to strengthen State and local government and improve the relations between those governments and the Federal Government through closer cooperation and coordination of policies and activities . . . ." 1968 U.S.Code Cong. and Admin.News at 4221.

This Act has been little construed. In *Conservation, supra,* 362 F.Supp. at 638, Judge Oakes used it as an independent basis for his ruling. The Court of Appeals sidestepped a determination of the propriety of Judge Oakes' alternate ruling by stating that such a determination was not necessary for its holding. *Id.* at 508 F.2d 936 n.44.

I am also inclined to avoid a determination on its applicability and do not rely on it in arriving at my decision.

## THE FEDERAL HIGHWAY ACT OF 1958, AS AMENDED, 23 U.S.C. § 128

▆▆ The public hearing section of the Act is designed to make the public aware and cognizant of the possible environmental harm that is inherent to any highway construction.

In ruling on whether defendants complied with NEPA, I gave thought and consideration to whether there was substantial compliance with Section 128(a). If a highway project is artificially segmented so that the public is unaware of the possible overall impact, then the broad purpose of Section 128 is defeated. *Arlington Coalition on Transp. v.*

*Volpe,* 458 F.2d 1323 (4th Cir.), *cert. denied* 409 U.S. 1000, 93 S.Ct. 312, 34 L.Ed.2d 261 (1972); *City of Rye v. Schuler,* 355 F.Supp. 17 (S.D.N.Y.1973).

Although I refuse to rule that there has been a violation of Section 128, defendants are put on notice that at any future corridor hearings for construction along Route 101, the public must be made aware of the impact that such proposed construction will have on further highway construction. To do otherwise is to mislead the public. *Cf. City of Romulus v. County of Wayne,* 392 F.Supp. 578, 588 (E.D.Mich.1975).

## FINDINGS AND RULINGS

1. That the proposed Milford bypass is necessitated by local traffic needs and its construction is not enjoined by this court in any way;

2. That there is now no specific overall Federal or State plan to construct a new east-west highway;

▆▆ 3. That a court need not find a specific plan to construct in existence before it can require the state to prepare a detailed EIS;

4. That the need for an EIS can be assessed from the underlying facts and circumstances and the inferences to be drawn therefrom;

5. That there is a federal-state partnership with regard to the construction of highway projects which could inevitably lead to a new east-west highway along Route 101;

6. That the FHWA knew or should have known that the construction which they approved for Route 101 could inevitably lead to a new east-west highway;

7. That a detailed regional EIS may be required even in the absence of a direct attack on a specific project;

8. That the NHDPW&H may decide to construct a bypass in Dublin at any time and that this proposed construction could be in substantial conformity with FST Priority No. 5;

9. That with the construction of the Milford bypass, approximately 40% of the necessary and major steps in the construction of a new east-west highway will have been completed;

10. That any further highway construction along the line suggested in the FST Study would ineluctably diminish the viability of alternative east-west routes in southern New Hampshire;

11. That inflation, the energy crisis, and other variable factors have caused a change in the NHDPW&H's construction priorities;

12. That the NHDPW&H's top priority is betterment construction;

13. That betterment construction along Route 101 is to be allowed in order to protect the safety of the traveling public, and that no EIS is required provided that the NHDPW&H uses only State funds in the construction;

14. That the FST Study is a blueprint for purposes of constructing a new east-west highway in southern New Hampshire;

15. That the NHDPW&H's priorities may change and, at any time, the State may decide that there is a definite need for a new east-west highway in southern New Hampshire;

16. That the construction of one highway project has a "money in the ground effect" which coerces further highway construction; and

17. That Route 101 is now sufficiently federalized so that any future construction which comports with any of the FST priorities or any construction which can be viewed as an integral link in the construction of a new east-west highway is to be deemed a "major Federal action" even though the NHDPW&H proposes to construct these projects only with State funds.

In arriving at my decision, I have considered all the evidence proffered except for Plaintiff's Exhibit No. 42–21 which I have excluded.

I cannot in good conscience close this opinion without giving credit to the attorneys for both parties for the painstaking effort that they have given to this case. The presentation of the issues is an example of the art of advocacy at its best.

## ORDER

This court will retain jurisdiction over this suit;

The defendants shall keep plaintiff and the court informed of any construction, except for "betterments," that is proposed for Route 101; and

Plaintiffs shall be allowed to bring forward their complaint should there be any further developments which suggest a violation of NEPA or any other environmental statutes.

So ordered.

## ADDENDUM

Since writing the body of this opinion, the Supreme Court has vacated *Conservation Society,* —— U.S. ——, 96 S.Ct. 19, 46 L.Ed.2d 29 (1975), and remanded the case to the Second Circuit Court of Appeals for reconsideration in light of Public Law 94–83 and *Aberdeen & Rockfish R. R. Co. v. SCRAP,* 422 U.S. 289, 95 S.Ct. 2336, 45 L.Ed.2d 191 (1975). I have considered *Aberdeen. See, supra,* Note 15.

Public Law 94–83 amends NEPA so that state highway departments or agencies may participate in the preparation of an EIS, a matter which is not involved in the instant case.

I do not believe that the Supreme Court's action in *Conservation Society* undercuts the legal analysis and theory on which this opinion is based.